Rost v. Henderson and others.

---

ODILLE D. ROST *v.* STEPHEN HENDERSON and others.

No right of action can accrue from a verbal disposition *mortis causa.* C. C. 1563, 1569.

The exceptions made by arts. 244, 245, and 246 of the third title of the third book of the Code of 1808, to the rule laid down in art. 243 of the same title and book, as to the proof of contracts which may be appraised in money, exceeding five hundred dollars in value, are virtually repealed by the Civil Code of 1825. C. C. 2257.

APPEAL from the Parish Court of New Orleans, *Maurian*, J.

SIMON, J. This appeal is taken from a judgment which refuses to allow to the plaintiff the sum of sixty thousand dollars, by her claimed of the heirs of the late Stephen Henderson, as being the amount of a verbal disposition *causa mortis*, or request *in extremis*, made and expressed by Mrs. Zelia Elenore Henderson, in the city of New York, a few days and immediately before her death, and which, it is alleged, her surviving husband consented to comply with, and promised to pay, thereby contracting the civil obligation towards the plaintiff, to pay her a sum of money which originally he was only naturally and morally bound for, under the verbal disposition or request of his late wife.

The facts established by the record are these : On the 19th of June, 1827, Mrs. Henderson made her olographic will, in which she instituted her husband, Stephen Henderson, her sole and only testamentary executor and heir to all and every part of her estate. The will was written by her in the English language, although her maternal language was French. Sometime in August, 1830, she went to New York : but, according to the testimony of a respectable witness, intimate with the family, Mrs. Henderson did not show to her husband, before her departure, the same friendship that she had before, and the witness explains, that "it was during the whole year preceding Mrs. Henderson's departure to the north, that he, witness, noticed the alienation of her sentiments before spoken of." The friendship between Mrs. Henderson and the plaintiff was very great, and mutual; they were sisters, and the deceased had no children.

Mrs. Henderson arrived in New York on the 17th of August, 1830, and was placed by her husband under the charge of Robert Dyson, one of his friends, who had been written to to that effect, and took her lodgings at the American Hotel, where she died on the 19th of September following. During her last illness, Mr. Dyson used to see her very often, at least twice every day from the time of her arrival to the day of her death, and he had always an opportunity of conversing with her fully and freely at every daily visit. She conversed with him freely and confidentially on her private affairs. She frequently spoke of her sister, and manifested the strongest affection for her. She also frequently spoke of a will she had made in favor of her husband; she said that she wished to annul it, in order that she might make another leaving her entire property to her sister. Dyson called, on two several occasions, on Mr. E. Livingston, who was then in New York, to get him to wait on Mrs. Henderson for the purpose of drawing up her new will. Appointments were accordingly made, but she deferred them, as she was too much indisposed to bear the fatigue of proceeding to the business. She afterwards deferred it, from time to time, under the expectation of feeling stronger, but never was well enough to proceed with the preparation of a new will. Under these circumstances, she stated to the witness, *that she gave then to her sister the sum of* $60,000 ; *that she wished her*

*verbal statement to that effect to be taken for and considered as a part of her will;* that she wished her said will to be considered as modified in that respect, so that her sister should receive the sum of $60,000; and she then, *in the most solemn and impress ive anner, called on Mr. Dyson to promise, on behalf of Mr. Henderson, that the said sum should be paid over by him, after her death, to her said sister.* She made this request of the witness several times, and repeated it the evening previous to her death. This disposition was explicitly and repeatedly declared by her to the witness, to be a modification and condition of her said will in favor of her husband; and the witness adds that he promised, that so far as was in his power, her request should be complied with, and he assured her that Mr. Henderson would perform it.

Stephen Henderson came to New York after his wife's death, and, on being apprised by Mr. Dyson of the dying request and last disposition of the deceased, replied, that *he would comply with and carry out the wishes of his deceased wife in that respect; that he would pay over to the plaintiff the sum of* $60,000; *that he considered it legally and morally binding upon him to do so; and that it should be complied with to the very letter.* He even went so far as to say, that he intended that the plaintiff and her daughter should receive the whole of Mrs. Henderson's property and more, and that he would not dispose of one cent of it in any other way.

The witness further testifies that he saw Mr. Henderson in New York again in 1833, and asked him if he had complied with his wife's wishes and request, as regarded her bequest and legacy to the plaintiff. He replied that *he had done so to the very letter; and made a statement, that he had made an arrangement for the payment to said plaintiff of the sum of* $60,000 *at a future time.*

No communication was ever made to the plaintiff or her husband by the witness, in relation to this matter, until the summer of 1838, when the witness accidentally learned that the plaintiff was not named in Mr. Henderson's will, and had received nothing from him. No one was present at any of the repeated conversations which were had between Mr. Dyson and Mrs. Henderson; nor was any person present, or within hearing, when Stephen

Henderson and the witness conversed in relation to the subject under consideration.

The record contains also the testimony of Grimshaw, who says, that he was in New York during the last sickness of Mrs. Henderson; that she was anxious to have the professional services of Mr. Livingston, for the purpose of making some testamentary dispositions; that she expressed her disposition to have a former will annulled or changed; that the disposition by her expressed in witness' presence was to have a new will made; and that her intention was to leave her property to her brothers and sisters in common.

The evidence also shows that Mrs. Henderson received from her father's estate about $112,000; that her husband, as universal legatee of his wife, took possession of the whole of her estate under the will; and that the amount of the inventory of her estate was upwards of *fourteen hundred thousand dollars*. The plaintiff is not named in his will, except in relation to a few small legacies.

It is perfectly clear that under our laws, and our system of jurisprudence, no right of action would accrue from a verbal disposition *mortis causa*. Art. 1563 of the Civil Code says, positively, that no disposition *mortis causa shall be made otherwise than by last will or testament;* and, under the provisions contained in the 1569th article, that "the custom of making verbal testaments, that is to say, resulting *from the mere deposition of witnesses,* who were present when the testator made known to them his will, without his having committed it or caused it to be committed to writing, is abrogated," it cannot be contested that such verbal dispositions can have no legal effect. In the case of *Barrière* v. *Gladding's Executor*, 17 La. 147, we held that the amount of a note, subscribed by the deceased, and shown to have been executed as a mere disposition *mortis causa,* cannot be recovered; *a fortiori*, should the rule apply to the verbal expression of what the testator wishes to be done after his death.

But it has been strenuously contended, that this action is not based upon the verbal disposition of the deceased Mrs. Henderson, but upon the subsequent promise on the part of the heir to pay the amount of the verbal legacy; that although the verbal

disposition is stated in the petition to have been the origin of the obligation, the right of action here exercised results only from the contract made and entered into by Henderson, after the death of his wife, to comply with her wishes, and to pay to the plaintiff the sum bequeathed to her verbally by the deceased. This has been urged with a great deal of force and ability by the plaintiff's counsel, whose principal position was, in the argument of this cause, that the obligation imposed upon the heir by the testatrix, being only a moral and a natural one in its origin, became subsequently legal and binding upon him, by his positive promise to execute it.

It cannot, in our opinion, be controverted, that the obligation contracted by Henderson, after the death of his wife, was, in its origin, *a natural one*, within the definitions contained in the *first* and *fourth paragraphs* of the 1751st article of our Civil Code, which says : 1st. " Natural obligations are such as the law has rendered invalid *for the want of certain forms*, or for some reason of general policy, but *which are not in themselves immoral or unjust ;*" and 4th. " There is also a natural obligation on those who inherit an estate, either under a will or by legal inheritance, *to execute the donations or other dispositions* which the former owner had made, but which are defective *for want of form only.*" Now, from several very respectable and distinguished authorities, which we have had occasion to examine upon this subject, and among them Toullier, vol. 6, No. 390, who says : " *La question se réduit à savoir si une obligation naturelle qu'on veut éteindre peut être la cause d'une nouvelle obligation civile qu'on veut lui substituer. Or, où pourrait être la raison d'en douter ?*" and who refers to a decision of the court of cassation, which establishes as a principle " *qu'une cause naturelle est suffisante pour la validité des actes ;*" we are not prepared to say, that the present action should be denied to the plaintiff, as arising from the subsequent promise or obligation contracted towards her by Henderson, and that, viewed in this light, she should not be entitled to recover. Indeed, the weight of the authorities appears to be on her side of the question, and her action would perhaps be successful, (Sirey, an. 1811, p. 323. Ib. an. 1827, part 1, p. 139,) if, in the words of Toullier, Vol. 6, No. 187, " *la preuve de l'obligation est faite de la manière reçue par le droit civil.*" The question then occurs in

Rost v. Henderson and others.

this case, has the obligation alleged to have been contracted by Stephen Henderson, been legally, and sufficiently established? If not, this is an insuperable barrier to the plaintiff's right of recovery, however satisfactory the evidence may have been with regard to the existence of the verbal disposition.

The promise alleged to have been made by the deceased's husband, after her death, is only proven by *one witness*, by Mr. Dyson, who states it in his testimony, as fully and as positively as it is possible to be. The facts, however, are not supported by any corroborating circumstances, and under art. 2257, of the Civil Code, all agreements relative to personal property, and *all contracts for the payment of money*, where the value exceeds five hundred dollars, which are not reduced to writing, must be proved at least by one credible witness, and other corroborating circumstances. It has been ingeniously argued, that this article does not exclude the idea of one witness being sufficient, when according to arts. 243, 244, 245, 246, page 310, of the Civil Code of 1808, the case comes within one of the exceptions therein pointed out, and particularly when the creditor has been unable to procure a literal proof of the obligation. We cannot adhere to such a proposition. Corroborating circumstances are now required in all cases; and as this court said in a case reported 5 La. 268, the exceptions made in the Code of 1808, by which contracts above five hundred dollars, might be proved by a single credible witness, not having been introduced into the present Code, are virtually repealed; and the testimony of one witness alone does not suffice to establish such contracts, without proof of corroborating circumstances. In vain has it been insisted, that the fact of the verbal legacy has been shown by the testimony of Mr. Dyson, and other circumstances going to corroborate it. This is clearly insufficient, as the action being founded upon a subsequent verbal promise to execute the disposition, and to pay the amount of the legacy, it is obvious, that this new obligation cannot be enforced, unless it is proven according to law. This, in our opinion, the plaintiff has failed to do.

We think the inferior Judge has come to a correct conclusion on the insufficiency of the evidence; but his judgment should only have been one of nonsuit.

It is therefore ordered and decreed, that the judgment of the Parish Court be affirmed so as to have only the effect of a non-suit, with costs in the lower court, those in this court to be borne by the appellees.

*Eustis*, for the appellant.

*E. Briggs*, *F. Grima*, *Roselius* and *Grymes*, for the defendants.*

---

*Eustis*, for a re-hearing. This action is founded on the facts disclosed in the testimony of Mr. Dyson—the strong wish of Mrs. Henderson in her last illness to alter the will which she had made in New Orleans ; her repeated declarations of such a wish ; the circumstances under which her last request was made, and her will left unchanged ; her dying request, that her sister should receive from her estate the sum of $60,000 ; her insisting on her husband's agent promising in the most solemn manner, that this last injunction should be complied with by her husband ; the assurance of the agent that this promise should be sacredly observed ; her death under the conviction produced by this assurance ; the communication of these facts to Mr. Henderson ; his implied ratification of all that Dyson had done, and his taking the estate of his wife under her will, as her sole and universal heir :—these facts taken together created on the part of Mr. Henderson an obligation to pay to his wife's sister the amount, which affection in its last moments had devoted to her benefit ; and if there be in the whole catalogue of human obligations one which the eye of justice ought to rest on with favor, it is surely this. A breach of it, not only wrongs the living, but defrauds the dead.

This statement does not contain the whole strength of our case. Far from it. But it is proposed, first, to consider the questions growing out of that state of facts alone.

I. The law immediately applicable to the case, as to the binding force and effect of a request and promise like those in evidence is well settled. If promises like this were not binding, the party would be enabled to accomplish a fraud, which the law in every case will hold itself competent to reach, and to prevent its effects. The testator is induced to maintain his testament on a promise, that certain wishes which are dear to him shall be complied with, provisions for an old and faithful servant, a friend, a relative, and dies under the conviction, that his wishes will be fulfilled. Shall the heir take the whole estate, and exempt himself from these charges, and thus thwart the intentions of his benefactor ?

The law on the contrary will compel the heir to be just, and prevent him from accomplishing what would be considered by all laws as a fraud. Powell on Devises, 696, *et seq.*, contains several cases in which this principle is carried out.

"If a man, having made his will, and his son executor, had said when he was dying, that he had a mind to have his wife executrix, and the son had said: Don't trouble yourself to alter the will, for I will let her have the surplus, and act as executrix, the Court of Chancery would decree it accordingly." The ground on which the learned author states that these requests are enforced, is not that of a trust, but of a fraud.

In the Supreme Court of Pennsylvania, the subject has received a very thorough investigation. It was there determined, that if a testator make a devise, under a promise on the part of a devisee, that it should be applied to the benefit of another, a trust is thereby created which may be established by parol, and this is not contrary to the statute of wills. *Hoge* v. *Hoge*, 1 Watts, 215.

The English cases are carefully reviewed and confirmed, in the opinion given by the Chief Justice, and some of them are so similar to this case, that it is thought worth while to cite them.

*Harris* v. *Howell*, Gilbert's Eq. Rep. 11. " A testator who had devised all his land to his nephew, desired his heir at law not to disturb him in the possession of certain after purchased lands, and it was so held."

*Chamberlaine* v. *Chamberlaine*, 2 Freeman, 34. This is very strong in support of the principle. " A testator having settled lands on his son for life, *and having discourse about altering his will* for fear there should not be enough to pay certain legacies to his daughter, was told by his son, that he would pay them if the assets were deficient, and it was held, *that having suffered his father to die in peace, on a promise which had prevented him from altering his will*, he should pay them himself; the Chancellor remarking that it was the constant practice of the court to make decrees on such promises."

*Oldhouse* v. *Litchfield*, 2 Vernon, 506. " Lands were charged with an annuity, on proof that the testator was prevented from charging them in his will by a promise of payment by the devisee."

*Thynn* v. *Thynn*, 1 Vernon, 296. " A son induced his mother, by promising to be a trustee for her use, to prevail on her husband to make a new will, and appoint him executor in her stead, and he was so decreed."

*Reach* v. *Kennegal*, 1 Vesey, 122. An executor and residuary legatee promised to pay a legacy not in the will, and was decreed to pay it out of the assets. Lord Hardwicke, in that case admits, that the rule of law and of the court, strengthened by the statute, is, *that all legacies must be written* in the will, *and that all the arguments against breaking in* upon wills by parol proof were well founded. But, notwithstanding, that the court had adhered to the principle, wherever a case is infected with fraud, the court will not suffer the statute to protect it so that any one shall run away with a benefit not intended.

In the Pennsylvania case, *Hoge* v. *Hoge*, the Chief Justice lays down as a rule, that a participation in the benefits of a fraud, having knowledge of its existence, or leaving *the means of knowledge unimproved*, would implicate the party as a confederate, and whether as an active or passive one would be immaterial to the question. 1 Maddock's Chancery, 266. Hovenden, an author

who treats on the remedial jurisdiction of the Court of Chancery in matters of fraud, lays down the rule as established by uniform decisions of that court. " Should an heir or personal representative, whose interests would be affected by the regular insertion of a bequest in a will, induce the testator to omit making a formal provision for an intended object of his bounty, by assurances that the testator's wishes should be as fully executed as if the bequest were formally made, this promise and undertaking will raise a trust, which, though not available at common law, will be enforced in equity on the ground of fraud ; and such an engagement may be entered into not only by words, but by silent assent to such a proposed undertaking." 2 Vesey & Beames, 262. 11 Vesey, 638. 9 Id. 519. 3 Id. 154. 2 Freeman, 34 and 285. 4 Vesey, 10. 18 Vesey, 475. These rules which have been found necessary, in the practical jurisprudence of England for the prevention of fraud, are they or not in accordance with the principles of our own laws ? Before this question is examined one or two matters must not be overlooked.

The statutes in England and in Pennsylvania, requiring all devises of land and tenements to be in writing, to be signed by the testator, and subscribed by witnesses, and the laws concerning the admissibility of parol evidence, are as rigorous as any of the provisions of our laws on the subject of testaments. 2 Black. Com. 376.

It is true, that in the English law verbal legacies, if made under certain circumstances, and proved in a certain way, may be valid. But in all the cases cited the verbal request has been enforced, not on the ground of its being valid, as a naked testamentary disposition complete in point of form, but as a condition, intended for the benefit of another, with which the devise stands charged, and which justice requires should be enforced, notwithstanding the defective form in which it appears. Civil Code, art. 1569.

It is true, that the usage of making verbal wills, formerly existing in this country, is abolished ; but by our laws the vice of fraud destroys the validity of all obligations, of all acts which it infects ; and a testamentary disposition, made like this universal institution in favor of the husband, lacks one essential requisite of a will, the intention of the testatrix. It would be going too far to say, that *courts of justice* would not provide relief in cases of this kind. There may be difficulties in getting at the facts ; there may be technical rules which exclude evidence of a particular kind ; but wherever the facts of a case like this are before a court, with sufficient legal evidence of them to satisfy beyond a reasonable doubt the judges of their existence, it seems to be scarcely reasonable to suppose, that the court can withhold the exercise of its powers in carrying out the will of the testator, and of preventing the recipient of the favor from setting at naught the very condition on which it was bestowed.

It is undoubtedly the duty of the court to carry into effect the provisions of our code in relation to the form of testaments ; but is it not equally incumbent on it to prevent fraud and deception from receiving the fruits of their works ? Are not good faith, truth, and equity as imperative in our laws, as the regula-

Rost v. Henderson and others.

tions concerning the form of wills. *Æquitas in omnibus, maxime injure spectanda est*. This is an axiom, a leading principle of the civil law, a system which has governed nearly the whole of christendom for ages, from the fact alone of its conformity to the eternal principles of justice.

Here we find the equitable provisions of our code concerning *quasi contracts*.

The lawful and voluntary acts of man, from which an obligation results, are as binding as any express and formal contract. Civil Code, arts. 2272, 2273, 2293.

These obligations have their foundation in the power of the law : *legis virtus est, imperare, vetare, permittere, punire*. This law is but an exponent of the principle. " *Jure naturæ æquum est neminem cum alterius detrimento fieri locupletiorem.*"

" *Vous êtes-vous enrichi, avez-vous profité par votre fait, ou, par celui d'un tiers, aux dépens d'une autre personne sans que celle-ci ait eu la vonlonté de vous gratifier ? Vous êtes engagé, vous êtes obligé, et, si vous l'êtes, il y a droit acquis à celui aux dépens de qui vous vous êtes enrichi. Plus de difficultés sur le point de l'engagement ou de l'obligation.*" 11 Toullier, No. 20. On this subject great controversies have been entertained among the learned. They are reviewed by Toullier, who states the rule with his usual comprehensiveness and precision. Vide also Merlin, Rep. de Jurisprudence, *verbo*, *quasi contract.*

There is no word in the English law which strictly corresponds with the word *quasi contract* ; but the class of cases is provided with remedies as efficient as under our laws. The courts of equity prevent frauds from being accomplished, and courts of law imply an assumpsit or promise whenever good faith and honesty require it to be made, which will give parties full relief in all cases of quasi contracts.

The question concerning the *admissibility of parol evidence* to establish the facts which occurred at the bed-side of the deceased, and her declarations, cannot be raised, for no objection was made to the admissibility of parol evidence at the trial. No·bill of exceptions was taken. The evidence is before the court, and the case must stand or fall by the weight of it. If parol evidence in regard to immoveable property be admitted without objection in the inferior court, it cannot be objected to on the appeal. *Babineau* v. *Cormier*, 1 Mart. N. S. 456. Our own code provides by an express article, (1842,) *for the mode* in which fraud must be proved ; that is, it provides, that it may be proved by any means which can be reasonably pre-supposed. It may be proved by *simple presumptions, by legal presumptions, and by other evidence*. The maxim, that fraud is not to be presumed, means no more than that it is not to be imputed without legal evidence.

To provide by law, that fraud should only be proved in a certain way, would be to establish, that it should not be proved at all.

It is sometimes supposed that there is something peculiar to the chancery system of England, which renders it inapplicable under our jurisprudence.

That the machinery by which a court of equity operates, is different from that by which our laws are administered, may be true, though the great difference is not so material as often imagined; but the principles upon which the two systems rest are identical. The equity system is professedly based upon the same laws as our own. The writings of Civilians are guides for the Chancellors, in all matters not purely arbitrary.

The Prætors of Rome held the first courts of equity of which we have any account. Their province was *juvare*, supplere, *interpretare*, mittigare, *jus civile non mutare vel tollere.* Dig. lib. 1. tit. 1. 7. Co. Litt. 24. b. In the writers of the civil law much matter may be found concerning legacies and testaments; and the principles before stated, although perhaps not acknowledged in so many words, are nevertheless recognized in reality and in practical application. 1 Poujol on Test. Don. 134, 178. 2 Id. 353. 1 Guilhou on Donations, No. 221.

Article 1479, of our code, purports to have extinguished many of the causes for which it is assumed that testaments might have been annulled under the civil law. Without this article, the motives of hatred and anger, or the facts of suggestion, or captation, would not be held sufficient in the present state of opinion to invalidate a will. The article quoted was proposed in the *projet* of the Napoleon code, and after deliberation rejected by the Council of State; but even in France, no testamentary disposition could be avoided unless the facts alleged in avoidance of it amounted to what is technically considered *as fraud* in equity. 5 Toullier, 663, No. 714. Comdeliste, Traité de Donations, p. 84, § 16.

*Quant à la suggestion et à la captation elles sont encore chez nous une cause de nullité; mais seulement quand le dol et les menées artificielles s'y réunissent,* (Furgole, Testam. ch. 5. § 3. No. 26 a 47. Grenier, No. 143. Merlin. Rep. Verbo Suggestion) *parce que, sans ces fraudes, le testateur aurait autrement disposé, ou laissé regler sa succession par la loi commune.*

Suggestion and captation from a third person for the benefit of a legatee is sufficient. 26 Sirey, 1st part, page 10. *Celui qui se croit l'objet d'un legs secret, peut le prouver.* 23 Sirey, 2d part, page 78. It would not be reasonable to suppose that article 1479 was intended to reach cases of fraud—that in other words it was intended to give validity to testamentary dispositions which should have any of the radical vices of error, fraud, or violence, which in law invalidate all obligations, all donations, all acts.

The explanation of the article is very obvious. Many of the old writers on donations maintained, that simple suggestion was a cause of nullity of testamentary dispositions. This idea was founded on a text of the Roman Law, Dig. lib. 11, tit. 2, *De servo corrupto.*

The error of this doctrine is shown by Furgole, *loco citato,* and Merlin, *loc. cit.* adopts his conclusions. A sound interpretation will confine the operation of the article to the objects mentioned, and consider it as declaratory of the law and as fixing its doctrine, and not as creating an innovation in jurispru-

dence. No evidence can, or ought to be received, of simple suggestion or cap-
tation, or of anger, hatred, caprice of temper, or any infirmity, unless it should
affect the reason in the one case so as to render the will uncertain, and in the
other, unless the suggestion or captation should amount to fraud.

The evidence of the suggestion and captation. which prevented the testa-
trix from changing her will, was admitted without opposition, and must have
its legal effect. Art. 1479. provides that *proof is not admitted* of testamentary
dispositions having been made through suggestion or captation, but parties may
waive the right they have to object to such evidence . Civil Code, art. 1767.
Thus although art. 2415 has provided in the same words that all verbal sales of
immoveables shall be null, as well for third persons, as for the contracting parties,
and that testimonial proof of them shall not be admitted, the Supreme Court
have decided that parol evidence, if not objected to, is valid to prove those
sales. *Strawbridge* v. *Warfield*, 4 La. 22. The allegations of suggestion and
fraud are sufficiently explicit in the pleadings, and are proved by evidence to
the introduction of which no objection was made. It does not matter whether
a fact is put at issue, provided it is established by evidence. *McMicken* v.
*Brown*, 6 Mart. N. S. 85. If a party mistake his rights in the pleadings, but
proves them by evidence not objected to, the defect is cured. *Bryan and wife*
v. *Morris*, 11 Mart. 26. *Canfield and others* v. *McLaughlin*, 9 Mart. 326.
*Flogny* v. *Adams*, 11 Mart. 547.

II. But did Henderson himself make a promise to the deceased, to pay the
plaintiff any sum of money ? There is no evidence that he did; but Dyson
made the promise for him. " She then in the most solemn and impressive
manner called on me to promise on behalf of Mr. Henderson, her late husband.
that the said sum of sixty thousand dollars should be paid over by him after her
death to her said sister. She made the request of me several times during
the few days preceding her death, and repeated it, I think, the evening pre-
vious to her death. I promised her that so far as it was in my power her request
should be complied with, and assured her that Mr. Henderson would perform
this her last request."

What authority had Dyson to promise for Henderson ? No express author-
ity. The only right he had to open his lips on the subject grew out of his re-
lations with Henderson which his testimony will explain.

Dyson became acquainted with Henderson in 1816, in New Orleans. He
resided here for several years, and while here saw Henderson very frequently
and intimately, and was on the most friendly and confidential footing with him.
He transacted his business in New York from 1821 until his death. Hender-
son went to New York frequently during that period, and when there was
familiarly at Dyson's house, advised with him confidentially as to his business
affairs, his personal affairs, and his family affairs.

Dyson of course was acquainted with Mrs. Henderson, and under his charge
during her last illness was she placed by her husband. Her reason was un-
clouded up to the time of her death, and every fact stated by Dyson in relation

to the matter in controversy is precisely that which would have occurred under similar circumstances.

Dyson's testimony is uncontradicted in every particular. It is based upon written memorandums made at the time. He refers to his letter book of Aug. 17th, 1830, to a letter to Mr. Henderson, announcing the arrival of his wife.

Mrs. Henderson died on the 19th of Sept. Dyson says in answer to a cross interrogatory, " I find on referring to my letter book that in a letter which I wrote to Mr. Henderson on the 22d of Sept., 1830, being three days after the death of Mrs. Henderson, I wrote to him in reference to Mrs. Henderson's wishes and donations (of which I have before given the details in my answers to the interrogatories,) in these words, " I have something to communicate touching the desire of Mrs. Henderson, which I shall withhold until *I see or hear from you.*" If there was anything in the testimony of this witness which was not strictly true, it could easily have been impugned. The parties defendant could have called for his book, or had it examined by a disinterested person. The testimony was on file for months before the trial. The executors having the papers of the deceased, and the heirs, having access to them at all times, could have disproved by Dyson's own letters (which they must be supposed, in the absence of any proof to the contrary, to have,) any *fact of agency* if it did not exist, which Dyson's testimony tends to establish.

His agency, his intimacy with Henderson, and the confidence reposed in him by Henderson, are proved by the fact of his wife being committed to his charge. To whom but a person enjoying in the highest degree the friendship and confidence of the husband, could a lady be committed, in her last illness, in a strange place?

Grimshaw's testimony as to the desire of Mrs. H. to change her New Orleans will, and as to Dyson's intimacy, and his being what he represents himself to be in relation to the parties, coupled with what has been before recited, renders the testimony of Dyson impregnable, and amounting to full proof in any court of justice.

Mr. Henderson went to New York after the death of his wife, and returned bringing with him, as Dyson believes, the mulatto servant of his deceased wife, who was the only person present at the scene in the bed chamber of the deceased, to which Dyson attests.

Dyson saw Mr. Henderson a few hours after his arrival in New York, and communicated to him the request and injunction of his deceased wife in favor of her sister, and his own promise in relation to it. Mr. Henderson then promised to *comply with it to the very letter*, and considered himself morally and legally bound so to do. Words cannot be more formal and positive than those used by him on the occasion. These are all the facts which it is now material to consider in this part of the argument.

If the promise be considered as having been made by Henderson himself, can there be a doubt of the plaintiff's right to take advantage of it? Is not the

consideration sufficient? Is not the injunction to carry into effect what was literally the last wish of his wife, creative of an obligation of a most sacred character on his part? The promise was made to the deceased by Dyson, but ratified and confirmed by Henderson, on receiving the consideration.

This is an equitable action which our code recognizes, Code of Practice, art 35. The action arises from equity, in favor of a third person not a party to the contract. Thus if one stipulates in a contract with another, that this person shall pay a certain sum of money or give a certain thing to a third person, this gives an action to the third person to enforce the execution of the stipulation. Civil Code, art. 1884. Code of 1808, 262. 2 Martin, N. S. 672, *Duchamp* v. *Nicholson*. Equity will never permit a party to enjoy a benefit, without complying with the conditions imposed with it. Hovenden, 274.

There is a further corroboration of this promise, on the part of Henderson. In the summer of 1833, he again went to New York. His friend Dyson of course, asked him if he had complied with the request of his late wife in favor of her sister. Henderson replied, "that he had done so to the very letter." He stated "that he had made an arrangement for the payment to the plaintiff of the sum of *sixty thousand* dollars, *at a future time*." Dyson adds, "I do not think he specified the time when he was to pay it."

It is obvious, that Henderson never pretended in his lifetime that he paid the plaintiff this amount. In this conversation it is clear, taking the whole together, that he considered the *arrangement* to pay the amount at a future time, as a compliance with the promise made by Dyson and himself. Will not this arrangement support an action for the amount? What is it but an acknowledgment of the obligation, and a promise to pay the amount due. Had the money ever been paid, or the obligation satisfied, the fact would have appeared by the papers of the late Mr. Henderson, and would have been pleaded formally, as it ought to have been.

As the matter now stands on the evidence, the obligation is unperformed on the part of Henderson or the defendants.

III. Did the promise of Henderson—that is of Dyson—produce such an effect on the mind of the testator as to render it obligatory?

That Mrs. Henderson wished to alter her will while she was ill in New York, is proved beyond contestation by the testimony of Grimshaw in corroboration of that of Dyson, and is rendered probable by the testimony of Le Breton, another witness.

Did she not die in peace, under the promise of Dyson, which prevented her from altering her New Orleans will? *Chamberlayne's case*, 2 Freeman, 34. She desired to alter her will. She told Grimshaw that she desired to benefit her brothers and sisters. Probably she did at that time; but the project of the will appears to have been given up on the assurance of Dyson of a compliance with the request, upon which she finally settled, in favor of her sister alone.

Let us suppose, that instead of promising as he did on behalf of Mr. Henderson, he had candidly told her that he could make no promise for himself or Henderson, who can say that she would not have altered her will?

It is in vain to say, that there was no time to accomplish this. No one can tell the effect of such a declaration on the mind of the deceased. The body and the intellect might have been roused to new action; an effort might have been made; new counsel might have been had; and her last wishes might have been put in a form which would have ensured their execution.

The future actions of persons laboring under disease are always uncertain, and subject entirely to conjecture. The test of the validity of obligations of this kind is this. Did, or did not the deceased die under the firm belief that her wishes and requests would be realized, and was this belief produced by the words or acts of those who are to benefit by the non-compliance of such request. That the deceased died under this conviction is undisputable, and that it was the result of the promise of Dyson is equally so. The distinction between inducing a person to make a new will, or not to alter an old one, cannot be maintained. The result of both acts is the same—a defeat of the intention of the testator. If the trust placed in Mr. Henderson by the testatrix is a *fidei-commissum*, it is one expressly authorized by law. Mr. Henderson was his wife's sole executor as well as her universal legatee; the payment of legacies of *sums* of *money* is a naked trust, which executors are required to perform; and to be enabled to do so, they are authorized to sell the property of the succession in default of money to a sufficient amount. Civil Code, art.1661—1663. The rule laid down, *Mathurin* v. *Livaudais*, 5 Mart. N. S. 303, is undoubtedly the true one. All trusts which executors can legally perform, may be performed by other persons, and do not come within the prohibition of art. 1517 of the Civil Code.

IV. In relation to the evidence requisite to charge the defendants in this case, it is to be observed, that if the request and promise be repudiated as forming a legal obligation on the heir and universal legatee, it certainly amounts to a representation which, if not obligatory, ought not to have been made, and must be considered as deceptive.

Deception may be established by any species of proof, verbal, written, or circumstantial and presumptive; Civil Code, art. 2267. " *Selon les règles du droit, la fraude ne peut être prouvée que par conjectures, et ne serait pas fraude si elle n'était occulte.*" *Coquillu, sur l'art.*, 40 *du ch. 4, de la coutume de Nivernais.*

Duranton, D'Aguesseau and Merlin unite in establishing the same rules. Rep. de Jurisp. de Merlin, *verbo*, Suggestion.

To prove a representation which would so operate under the circumstances as to deceive a person, the uncontradicted testimony of one witness is sufficient under our law.

Why not? What is there in the law requiring more? It is not an agreement creating an obligation. It is a fact, which, coupled with another, makes a

quasi contract; Civil Code, art. 2273. *All acts* from which any obligation results to a *third* person, &c.

Does the law require more than one witness to prove an act—a fact? Surely not. Cannot a fact be proved by presumption—by anything inducing a rational belief?

It is urged that the testimony of two witnesses, or of one witness and corroborating circumstances, are necessary to establish the agreement on which this action is founded; Civil Code, art. 2257.

In order to understand this article 2257, in its proper import and application, it is necessary to refer to our legislation on the subject. The article, it is believed, has never received any judicial interpretation. It is so important in its operation, being more often perhaps referred to on the trial of cases than any other arbitrary rule of evidence, that a full discussion of it will not be without its advantage.

By the Code of 1808, covenants or agreements, the objects of which could be appraised, in money, could be proved, if no writing were made of them, only by the oath of two competent and credible witnesses, in all cases exceeding $500—under that sum the testimony of one winess was sufficient. Code of 1808, p. 310, art. 243. But in the former case, the testimony of one witness sufficed, if there existed a beginning of proof in writing, by which is meant any writing emanating from the party rendering the fact probable; art. 244.

There were several exceptions to the rule of art. 243. It did not apply to mercantile sales and transactions, nor the sale of crops and of produce; art. 245.

It did not apply to necessary deposits, and those made by travellers at an inn, according to the quality of persons, and the circumstances of the fact.

It did not apply to cases in which there was an impossibility of the creditor's procuring *literal proof* of the obligation, meaning proof in writing; art. 246.

It did not apply to obligations arising from *quasi-contracts*, offences or *quasi-offences*.

It did not apply to obligations contracted in case of unforseen accident, where there was no possibility of making acts in writing; nor to cases in which the title was lost; art. 246; not to cases where only one witness could be had, without great difficulty. Febrero, L. 63, C. 1, No. 328, p. 326. Thus it will be seen that these numerous and comprehensive classes of cases were excepted from the operation of the art. 243. The art. 243 establishes a mere arbitrary rule directly in violation of the great principle, which since the abolition of torture and the machinery of judicial proofs, forms a part of every system of jurisprudence. " *Testimonia ponderantur, non numerantur.*"

It was necessary to exclude from its operation the great multitude of cases which occur in the ordinary affairs of men. This was done by means of sweeping exceptions. Article 243 is for all purposes of evil completely emasculated. It certainly was not wise in legislation to establish a general rule in a code and then destroy it by exceptions. Accordingly in our new code of 1825, the anomaly was remedied, and a more just rule was established which should be

general in its application, and the whole subject was merged in art. 2257, which rendered, in all cases of contract, the evidence of one witness and of corroborating circumstances sufficient to establish it; the concurrence of a credible witness, and of circumstances which rendered the facts testified to probable, being all that, in any case, ought in reason to be required. *Vide Projet* of Civil Code. The suppression of articles 243 *et seq.* of the code of 1808, and the enactment of art. 2257, of the present code in their stead, could in no sense be considered as a repeal of the exceptions they contained.

Could not an obligation resulting from a necessary deposit in case of fire, shipwreck, or other accident—from a quasi contract—be now proved by one witness and corroborating circumstances of quality, condition, pursuits, and habits of the party, as well as under the Code of 1808? There is no difference in the law under the two Codes as to the cases excepted.

As to the meaning of the terms *corroborating circumstances* one can scarcely be at a loss. They have no technical meaning, and it is believed they are not used in any part of our Code, except in the article under consideration (2257.) Anything relative to the subject of the deposition of the witness which renders it probable, may be considered as a corroborating circumstance. The circumstance must be *a fact* about which there can be no question, before it can be considered as forming a presumption, or corroborating circumstance of a fact in question.

Whether a fact creates a presumption, or is a corroborating circumstance, rests with the judgment of the judge or jury. It would be difficult to establish any general rule as to the effect of this, or of any other species of evidence. The end of evidence is to create belief. Belief is involuntary, and under no human control; and it is vain to attempt to limit, or control it by any rule.

Presumptive evidence is under this article admissible to corroborate direct testimony. The presumption results from circumstances. Any fact which affords presumption may be resorted to and received as evidence. On the subject of presumptions, not established by law, our Code has an express provision.

"Presumptions are left to the discretion of the judge, who ought to admit none but weighty, precise, and consistent presumptions, and only in cases where the law admits testimonial proof, unless the act be *attacked on account of fraud or deceit.*" Civil Code, art. 2267.

Is it not a reasonable conclusion from this article, that any facts which produce a strong presumption—one which is positive and definite, consistent with the deposition to be confirmed—those facts being consistent with all the other facts of the case and those sworn to, are proper evidence, and must be considered as corroborating circumstances?

Indeed what does the article require in order to render efficient the deposition of a single credible witness? Circumstantial evidence, and what is that but presumptive evidence which is any which is not *direct and positive.* The article can mean nothing else. It provides that the testimony of one witness shall not be sufficient to establish certain agreements or contracts, unless that

testimony be supported or rendered probable by circumstantial evidence, " *Testis unus, testis nullus,*" unless facts afford a presumption of the truth of his declaration.

It may be conceded that the corroborating circumstances must be established otherwise than by the deposition of the witness.

Now it is evident that the facts in this case establish a chain of circumstantial evidence, the force of which is irresistible.

In the first place, the basis of facts is proved beyond all question. They all render the last request of the testatrix probable. Her large estate, her being on bad terms with her husband, her absence from him, her affection for her sister and her children, and all the other settled facts, coincide in tending to this result.

These coincidences of a moral kind are not the less effective on a rational and moral agent, than those which are exclusively material. If a party, as in this case, has in his power the means of disproving the evidence offered against him and neglects to do it, the omission affords a strong presumption of its truth, for it would be contrary to all reason and experience to form any other conclusion. Starkie, 488, 489.

The defendants have, or are supposed to have, the correspondence of Dyson in their possession. They could refute his deposition, if it were not true. They have the best means of bringing the truth to light. They do not use the very best evidence the case requires, but rely on mere matters of form to weaken it. This is a circumstance of great import in weighing the testimony. The possession of a document which would decide a disputed point, and the omission to produce it, is a strong presumption against the party having it. 4 Burrows, 2484. The requisites to give effect to circumstantial evidence are all found in this case: 1. Dependent as well as independent circumstances— all coincident and concurrent: 2. The absence of any testimony tending to a different conclusion: 3. Cumulative and concurrent probabilities: 4. All these excluding every other hypothesis, when the deposition is considered with them.

Dyson in his testimony swears positively to the truth of part of a letter addressed to Henderson, on receiving the dying injunction of his wife. He gives a sworn copy of his letter taken from his letter book. It is insisted that this fact—this letter—is an independent fact which must be considered as a corroborating circumstance, because the means of ascertaining its truth rest exclusively with the defendants.

It is obvious that this verbal declaration as to the contents of a written instrument would not have been admitted, except by consent, without a notice to produce the original; and, by waiving this right and admitting parol evidence of a document in their possession, do not the defendants in fact consent that the contents of the documents shall be ascertained by Dyson's testimony? Is not this an independent fact, of the truth of which the defendants alone hold the

test? The evidence being admitted without objection, can any valid argument be urged against its effect?

It is proved by two witnesses, (Dyson and Grimshaw,) that the testatrix desired to make a new will in New York, during her last illness; and that she sought the means of so doing. *This fact*, with its circumstances, corroborates, in the most conclusive manner, the deposition of Dyson.

What stronger circumstantial evidence can be required in order to corroborate his testimony, than the relations of friendship and business which existed between Henderson and Dyson? The former entrusted the latter with the charge and protection of his dying wife, and gave him, in the most unlimited degree, his confidence. There can be no question that their relations were of the most intimate and confidential character, and that the testatrix participated in them. The correspondence and the books of Henderson would have shown it, if this fact had been questionable. Is not this a circumstance independent of the testimony of the witness which fortifies it? Are all witnesses in the eye of the law equal? Are they mere material machines to be counted? Are opportunities, probabilities, all moral resources to be excluded from consideration? The law implies no such absurdity. It does not mean that one, two, or forty witnesses shall be believed. Belief is beyond all human control. The law requires the testimony of a witness to be corroborated by circumstances in a case like this, and what can give more weight to his declarations that the fact of his position with both parties, rendering it probable that he would be entrusted with a mission, for which it is established *aliunde*, that he had their mutual confidence.

The court, in their opinion, state that art. 2257 of the present Civil Code has repealed the exceptions to the rule of the code of 1808, that two witnesses were required to prove contracts above $500 in value.

This is believed to be an error, and the court are respectfully requested to examine the question, without reference to the case of *Alison* v. *Cox*, where that opinion was first intimated.

The jurists, who prepared the amendments to the code, proposed in their *projet* to suppress the article requiring two witnesses, and all the exceptions to it, and to replace them all by art. 2257. This change was made. Viewed by itself it may receive two interpretations. It may be considered either as a repeal of all the exceptions, requiring after its adoption more evidence in the cases excepted than was required before; or, as an extension of the original rule, intended to continue and to embrace all those exceptions, by making the peculiar facts which had rendered them necessary under the former law, corroborating circumstances: so that, for instance, in a necessary deposit made in case of fire, or shipwreck, or by a traveller at an inn, in cases of *quasi-contracts*, and in those where written evidence could not be procured, the proof of those facts would be sufficient to corroborate the testimony of a credible witness.

A reference to the *projet* itself, however, and to the various reports made by its authors to the legislature and adopted, can leave no doubt as to the inter-

pretation which they themselves gave to the amendment; and this we consider as the safe and only guide. They did not propose to repeal the exceptions, as they invariably did when a repeal was intended, but only to replace the exceptions and the rule by a new rule. The known tendency of their minds, their various communications to the different branches of government, and we may add the spirit of the age, repudiate the idea that they intended to encumber the law of wisdom with restrictions which did not before exist. They were of the school of Jeremy Bentham, and felt the force of the maxim, *testimonia ponderantur, non numerantur.* It may be said of them without disparagement, that if they had a fault it was the other way, and that in their anxiety to perfect our jurisprudence, and to shape it according to the rules of modern ethics, they introduced into it, a vast deal of doubt and uncertainty. This is a serious evil, but it shows that in all they did, their tendency was towards theoretical perfection, and that as, on the subject of evidence, their avowed object was to do away as much as possible with restrictions to the admissibility of witnesses, leaving any objection against them to go to their credibility, it cannot be supposed that they intended to increase those restrictions in any case, where a different interpretation flows naturally from the course they pursued, and is in accordance with their views.

It was never intended to repeal any of those exceptions. A beginning of proof in writing is now a corroborating circumstance. It was defined a paper emanating from the person to whom it was opposed, rendering the fact alleged probable. Art. 2257 is an extension of this rule. It provides that instead of a beginning of proof in writing, any circumstance rendering the fact probable shall be deemed sufficient. " *La déposition d'un témoin, accompagnée de circonstances qui la corroborent,*" can have no other meaning. Every circumstance of whatever kind, which renders the fact probable, corroborates the testimony of the witness.

The court consider that all the facts sworn to by Dyson, except the contract of Mr. H., as sufficiently proved. They entertain no doubt as to his veracity ; and, therefore, they know as men, if not as judges, that Henderson did make such a promise, so that under the view they have taken, the technicalities of law stand alone in the way of justice. Under those circumstances, slight corroborating circumstances ought to suffice ; and before making absolute a decree which may work an irreparable injury to the plaintiff, the court are ernestly requested to consider whether sufficient evidence has not been adduced in this case.

The fact of this claim being founded on a quasi-contract, is, as already stated, a corroborating circumstance ; and the impossibility of procuring written evidence is another. Besides these, the relationship and intimacy of the parties, and the ancestor of the defendants receiving from his wife half a million, one-fifth of which would have come to the plaintiff by descent if the will had been destroyed, are circumstances which render the fact probable in a high degree.

Leave the evidence of Dyson at the point where the court says it ceases to

(*)

be conclusive. After he had informed Mr. Henderson of the last disposition of his wife, and of the promise he had made her, and requested him to comply with it, can any body doubt what his answer must have been, judging by the rules of justice and right as applicable to this case. Would not any one say that he must have agreed instantly to pay the legacy ? The facts peculiar to the case which create that impression, apart from any direct evidence, are the strongest corroborating circumstances that can exist. The quality of the witness also is a material circumstance. By law, every person over fourteen years of age, of sound mind, free or enfranchised, and not infamous, is a competent witness ; so that, however dishonest and corrupt a man may be, if he has escaped conviction in a case of felony, he is a competent witness. The testimony of such a witness is the lowest grade of evidence, and might be placed at the foot of the scale, when that of such a man as Dyson would stand at the head of it. The law, in speaking of a credible witness, has no reference to either of these extremes, but to the common standard equally removed from both. Below that standard the witness is often not credible ; above it the circumstances of position, character, and knowledge, which increase his credibility, must be considered as corroborating his deposition. The court will perceive at once, that if any other person in New York certified to the same facts, his deposition would not create belief to the same extent as that of Mr. Dyson.— Why should not this be a corroborating circumstance ? Again, Henderson told Dyson, in 1833, that he had complied with the request of his wife, and made with the plaintiff an arrangement by which he was to pay her at a future day. The same witness proves as conclusively as a negative can be proved, that the plaintiff was not aware of the disposition of her sister in her favor, until apprised of it by him in 1838, after the death of Henderson. This is explained by the fact that Henderson did make to the plaintiff, who accepted it, the promise mentioned to Dyson, but made it as coming from himself, and did not state to her the real consideration. Under art. 1888 and 1894 of the Civil Code, the contract was not the less valid, because a valuable consideration existed at the time, and the concealment was an artifice which kept the plaintiff in ignorance of her rights, till after the death of Henderson, and thus prevented her from procuring written evidence of the promise. Such an artifice is a fraud which one witness is competent to prove, and of which his heir cannot take advantage.

It appears to the plaintiff's counsel, that corroboratory circumstances are not limited by law to any particular class of facts, and especially not to those that occurred at the time of, or since the contract, and having a direct and necessary reference to it ; but that, on the contrary, any circumstances whatever which, coupled with the deposition of one witness, leave no doubt upon the mind, are sufficient in law, as they are in reason :

That under a proper interpretation of art. 2257, quasi-contracts, and the attested impossibility of procuring written evidence, are each a sufficient corroborating circumstance :

That if the conrt would ask themselves what corroborating circumstances would be admissible, under the rule they seem disposed to adopt, they will find that rule in most cases impracticable, and subversive, as it may be in this, of the great ends of justice.

*Re-hearing refused.*