## No. 13,666.

SUCCESSION OF MISS EMILY C. SINNOT VS. HIBERNIA NATIONAL BANK ET ALS.

### SYLLABUS.

1. There can be, in Louisiana, no legal manual gift *"causa mortis"* of a movable whether it be a corporeal or an incorporeal movable.
2. Donations *"causa mortis"* differ from donations *"mortis causa"*; the former are not authorized in Louisiana by its law. Property can neither be acquired nor disposed of gratuitously, unless by donations *inter vivos* or *mortis causa*.

APPEAL from the Civil District Court, Parish of Orleans— *Ellis, J.*

*Frank McGloin* for Executrix and Universal Legatee, Plaintiff and Appellant.

*Horace E. Upton* and *Solomon Wolff* for Mrs. George Langtry, Defendant and Appellee.

*Bernard McCloskey* for Hibernia National Bank, Defendant, Appellant.

The opinion of the court was delivered by NICHOLLS, C. J.

### STATEMENT OF THE CASE.

NICHOLLS, C. J. Mrs. Nita Bohn, wife of C. Otto Weber, in her petition in this case, avers that the late Miss Emily C. Sinnot, at the date of her death, owned twelve shares of the capital stock of the Hibernia National Bank of New Orleans, said stock being covered by certificates Nos. 50 and 128 for nine shares and three shares respectively.

That she is the testamentary executrix and residuary legatee of Miss Emily Sinnot and as such entitled to take possession of all the property of said deceased. That considering and believing that said certificates were lost or destroyed, she applied to said corporation for new certificates, and at its instance advertised for them for ninety days as lost; that applying at the end of that delay, she was informed by the officials of said Bank that Mrs. Annie Thompson, wife of George Langtry, had presented a written claim to said stock, declaring herself in possession of the certificates and owner of the stock. That said claim was pretended merely and untrue and her pretensions without warrant, and constituted a slander of title and had caused petitioner, as residuary legatee, damages in the full sum of two hundred and fifty dollars for annoyance, loss of time and attorney's fees, for which she and her husband, who authorized and participated in her pretensions, were liable to her *in solido.*

That there are dividends accrued and to accrue on said stock to which petitioner in her said capacity was entitled, and payment whereof to her had been refused by the Bank. She prays for citation upon the said Mr. and Mrs. Langtry and the Hibernia National Bank and for judgment against Mrs. Langtry, decreeing the succession of Miss Emily C. Sinnot to be the owner of said stock, condemning Mr. and Mrs. Langtry to surrender said certificates if them they had, and to pay petitioner the said damages with interest; that if said certificates were not in existence the Hibernia National Bank be ordered to issue duplicates as demanded, that said Bank be condemned to render an account of dividends due upon said stock and to become due pending

the litigation, and to pay the aggregate thereof to petitioner as executrix.

The defendant, Mrs. Langtry, answered, pleading first the general issue. She admitted having filed a written claim to the stock mentioned and described in plaintiff's petition, and averred that she did so because, in truth and in fact, the said stock was owned by and was the property of respondent.

That some time prior to the death of Miss Emily C. Sinnot, viz., in the month of July, 1896, the said Miss Emily C. Sinnot gave and delivered to respondent the certificates for twelve (12) shares of the capital stock of the Hibernia National Bank of New Orleans referred to and fully described in plaintiff's petition; that the same had been uninterruptedly, from said date, in the possession of respondent as owner thereof, with the full knowledge of plaintiff herein.

In view of the premises respondent prayed that there be judgment in her favor and against plaintiff, decreeing her to be the owner of the said twelve (12) shares.

The Hibernia National Bank answered, first pleading the general issue. It then alleged that there was of record on the books of the said Bank certificate No. 50 for nine shares and certificate No. 128 for three shares of the capital stock of the Hibernia National Bank in the name of Miss E. C. Sinnot; that one Mrs. A. M. Langtry had notified defendant that she was the holder and owner of said certificate specified as aforesaid. That this defendant was informed that the same were neither nost nor mislaid and, therefore, it could not be compelled to issue to any person or persons new certificates of stock.

That Mrs. A. M. Langtry should be made party to this suit to defend any rights she might have in the premises.

In view of the premises defendant prayed that Mrs. A. M. Langtry be cited, and that there might be judgment dismissing this suit as to it, and that the court render such judgment as would protect this defendant.

The court rendered judgment in favor of Mrs. Langtry and against the plaintiff and against the Hibernia National Bank, decreeing Mrs. Langtry to be the owner of certificate No. 50 for nine shares and certificate No. 128 for three shares of the Hibernia National Bank of this city, and further decreeing that upon the surrender by her of said certificates for twelve shares of the stock aforementioned to said Hibernia National Bank, standing in the name of Miss E. C.. Sinnot on

books of said Bank, that new certificates for same issue to said Mrs. Anna Thompson, wife of George Langtry.

It further ordered that plaintiff's petition be dismissed.

Plaintiff appealed.

The certificates declare that Miss E. C. Sinnot is entitled to nine (and to three) shares of the capital stock of the Hibernia National Bank * * * transferable only on the books of the Bank by the said Miss E. C. Sinnot or her attorney on surrender of this certificate.

## OPINION.

Mrs. C. Otto Weber, as the testamentary executrix and residuary legatee of Miss Emily C. Sinnot, claims the ownership of certain twelve shares of stock of the Hibernia National Bank to be in the succession of Miss Sinnot, and that the certificates for said shares are in the possession of Mrs. Langtry, who asserts ownership of the shares themselves. She brings this suit to have said ownership decreed to be in said succession and to have Mrs. Langtry directed to deliver the certificates to her in her said capacity. Mrs. Langtry claims ownership of the shares under an alleged gift to her from Miss Sinnot prior to her death.

Mrs. Langtry, as a witness on the stand, testified that she was the owner of the shares of stock claimed, covered by certificates Nos. 50 and 128; that she had been in possession of the certificates since July, 1896, uninterruptedly; that they were handed and given to her by Miss Sinnot, and she had them in her possession from that time up to the time of testifying; that she and Miss Sinnot had a conversation with reference to the certificates; Miss Sinnot told witness she should keep them, and she gave them to her saying: "They are yours—at least after my death they are yours." During Miss Sinnot's lifetime witness did not consider she had anything to do with them. She said "after my death I want you to have them," and she gave them to witness—that was in 1896. The ownership of this stock was to become absolute in witness at the time of Miss Sinnot's death, but before that she had nothing to do with them. Witness collected no dividends paid upon the stock.

Mrs. Weber was aware that the certificates were in witness' possession before she became executrix. She became aware of that fact about a year before Miss Sinnot's death in 1897 or 1898; she saw them in witness' possession, she knew that she had them; Miss Sinnot was

between eighty-two and eighty-four years of age when she died. She was delicate and had been so for many years. Miss Sinnot lived with witness from 1878 up to six months of the time of her death; she boarded with witness and paid her board; she died on December 6th, 1897. Witness was not related to her nor was Mrs. Weber. She was an old friend of witness' and had known witness since childhood. Witness paid her every attention when she lived with her; there was scarcely a day that she was out of her sight; she was with her all the time, she was very fond of witness and went to live with her by preference.

In addition to this property Miss Sinnot gave her a bed-room set and some table silver which she said should be witness' after her death; that also was in witness' possession; she had possession of it during Miss Sinnot's life. A part of it was taken during Miss Sinnot's life, but no matter what she asked for witness would have given it to her during her lifetime. Mrs. Weber knew witness also had the movables and silver.

On cross-examination witness produced the certificates and handed them to counsel of the executrix; saying they were in the same condition all the time; there were several dividends declared on these certificates while they were in witness' possession; she made no effort to collect any of them; witness recognized them as belonging to Miss Sinnot. After her death they belonged to witness, before her death of course they did not. Miss Sinnot, or somebody else for her, collected the dividends because it was understood they were not witness' until after Miss Sinnot's death, just as the bedroom set and the silver. As she (Miss Sinnot) said to witness: "I will give them to you after my death," naturally she was at liberty to take them at any time. It was understood between witness and Miss Sinnot that the title of the stock remained with her until she died, and that witness' right arrived at the moment of her death. There was no mistake about that; nobody was present when this conversation took place; she went into witness' room and said: "Anna, I want to do something for you when I die, I want you to keep these and when I die this bed-room set and silver and anything else that is in your possession when I die, you can keep." They spoke about it several times. Miss Sinnot said: "I want you to keep them."

They were given to witness some time after Miss Sinnot had made her will. She went into witness' room some six or seven months after the will was made, and she said: "I want you to keep them after I am

dead." Witness knew nothing of the will then, witness did not expect Miss Sinnot would have a clause in her will to carry out this intention; she gave them to witness just as she did the silver and the bed-room set. Being asked whether the certificates were given to her only in the contingency that they should be witness' after her (Miss Sinnot's) death, she answered: "That is right." Witness did not know to whom they belonged if witness had died first; that was not discussed.

This happened about two years before Miss Sinnot died; during these two years Miss Sinnot collected the dividends. She acted with complete dominion and control over them and she was free to come and get the certificates from her at any time. Witness did not tell any one about this happening between Miss Sinnot and herself. She made no more remarks about this than anything else given to her. It was a matter between witness and Miss Sinnot, just as it was about the other things she gave her. Witness was the only person who knew anything about that conversation.

On re-examination witness stated that Mrs. Weber knew that she had possession of these certificates about two or three years before Miss Sinnot died. Before Miss Sinnot gave them to witness Mrs. Weber had never made any demand of witness for possession of the certificates either as the representative of Miss Sinnot before her death or as her executrix, except by advertising for them in the newspapers. She had made no demand either by letter or in person for either the stock or the silver or movables. She had knowledge witness had them; Miss Sinnot, up to the time of her death, could have got them simply for the reason that she said that after her death they would be witness', and during her lifetime if she had demanded the silver or the furniture she could have taken it. Witness claimed no interest in the stock or furniture or silver until after Miss Sinnot's death.

The executrix (appellant here) urges that Mrs. Langtry's testimony, uncorroborated, is not sufficient to establish title to Bank stock worth twenty-three hundred dollars, particularly title by a manual gift from one dead through private conversation between the parties, and her counsel refer the court to Article 2277 of the Civil Code, and Cavalier vs. Collins, 3 Martin, 189; Derbes vs. Decuir, 5 Rob. 491; Brent vs. Slack, 10 Rob. 371; McCrea vs. Marshal, 1 Ann. 29; Andrew vs. Keenan, 14 Ann. 705; Gardes vs. Schroeder, 17 Ann. 142; Moore vs. New Orleans, 17 Ann. 312; Brady vs. McWilliams, 19 Ann. 433; Cutler vs. Collins, 37 Ann. 97; State *ex rel.* Care vs. Judge, 37 Ann. 380; Citizens'

Bank vs. Moreau, 37 Ann. 863; also to Succession of Fox, 2 Rob. 299; Succession of Segon, 7 Rob. 112; Bringier vs. Gordon, 14 Ann. 275; Bodenheimer vs. Bodenheimer, 35 Ann. 1007; Wood vs. Egan, 39 Ann. 687.

She invokes the presumption *nemo facile presumitur donare* and cites Packwood vs. Dorsey, 6 Rob. 331; Cooney vs. Ryter, 46 Ann. 883 and Am. and Eng. Ency. of Law, Vol. 14, p. 1049.

She directs our attention to Articles 1536 and 1538 of the Civil Code, which declare that an act shall be passed before a notary public and two witnesses of every donation *inter vivos* of immovable property or incorporeal things such as rents, credits, rights or actions under the penalty of nullity, and that a donation *inter vivos* even of movable effects will not be valid unless an act be passed of the same' as before prescribed, and that such an act ought to contain a detailed estimate of the effects given.

She admits that by Article 1539 of the Code "the manual gift, that is the giving of corporeal effects, accompanied by a real delivery, is not subject to any formality," but she contends that the manual gift refers to objects which can pass from hand to hand; that the property must be both movable and corporeal and capable of a "real delivery." (C. C. 478, Succession of Webre, 3 Ann. 270.)

She contends that when a note payable to order and unendorsed or a certificate of stock unendorsed and not transferred in writing is handed by one person to another, even with the intention to give, the gift is not complete. (13 La. 410; 22 Ann. 144; 31 Ann. 485; 49 Ann. 1424; Am. and Eng. Ency. of Law, Vol. 14, p. 1006.)

That incorporeal rights, not negotiable or endorsed to bearer, are transferred only by formal written transfer in addition to delivery of the evidences of the rights. (C. C. 1905 ,2841; 30 Ann 1425; 35 Ann. 271; 41 Ann. 1425.)

That shares of stock are incorporeal things and can not be donated *inter vivos* except by act before a notary and two witnesses. (Civil Code, Arts. 460, 1536; 12 Rob. 76; 17 La. 148; 5 Ann. 539; 22 Ann. 97; 27 Ann. 97; 30 Ann. 1381; 50 Ann. 1035; 65 Md. 93; 57 Am. Rep. 301; 2 Gill, J., (Md.) 208; 45 Md. 155; 48 N. J. 455; 10 Pa. St. 373; Colonial Bank vs. Whinney, House of Lords,- 11 App. 426.)

That where the certificate of stock is, on its face, not transferable on the books of the company except by the nominee in person and on surrender of the certificate, the mere delivery of the certificate unendorsed

and not transferred in writing passes no title. (11 La. 410; 22 Ann. 144; 31 Ann. 485; 49 Ann. 1424; Am. and Eng. Ency. of Law, Vol. 14, p. 1016.)

That a donation *inter vivos* must divest in the present and irrevocably the interest of the donor in behalf of the donee. Any reservation of interest or retention of control by the donee nullifies the donation. (C. C. 1467, 1468, 1529, 1533; Fuzier Hermann Code Civil Annote, Art. 946; Notes 1, 2, 5 Am. and Eng. Ency. of Law, p. 1015; 4 Ann. 130; 5 A nn.433; 12 Ann. 721; 14 Ann. 710; 31 Ann. 485; 46 Ann. 1378.)

That when it is stipulated that ownership is not to pass until the death of the donor, it is a donation *mortis causa* and being verbal such a transaction is an attempt to make a verbal will and hence nugatory. (C. C. 1467, 1574, 1576, 1595; 5 M. 614; 4 Rob. 468.)

The appellee insists that there was a donation of the certificates, accompanied by a real delivery; that a certificate of stock is a "corporeal or movable effect," which may be given without the formalities prescribed by Art. 1536 C. C.; that it is not an incorporeal thing such as rents, credits or rights. That Art. 1539 of the Civil Code of Louisiana is not to be found in the Code of France. Counsel of appellee refers the court to Cook, Vol. 1, Sec. 12 (3rd Ed.); Cook on Stocks (3rd Ed.); Thompson, Vol. 1st, Sec. —, Vol. 1, p. 22; Note 6, 10, 66, and 1070; Morawetz on Corporations (2nd Ed.), Vol. 1, Secs. 193, 225 and 226; 31 Lawyers' Reports, Annotated, 429 (Leyson vs.; Davis); Ency. of Law (1st Ed.), Vol. 23, p. 593, note 5 and text; Story on Sales, Sec. 263; Allenton vs. Long, 10 Bosworth (N. Y.), 362; Walsh vs. Sexton, 55 Barb (N. Y.); Grymes vs. Hone, 49 N. Y. 17; 2 Kent 444 (14th Ed.); North vs. Forest, 15 Conn. 40; South Ins. Co. vs. Cole, 4 Fla. 359; Schollmeir vs. Schoendelen, 78 Iowa, 426; 16 Am. St. Rep. 455; Scrivens vs. Northeastern Bank, 166 Mass. 255; Harris vs. Bank, 5 Ann. 539; Smith vs. Crescent City, Etc., Co., 30 Ann. 1378; 1380; Succession of Poilly, 22 Ann. 97; Burke vs. Bishop, 27 Ann. 467; Succession of Moore, 40 Ann. 541; Kern vs. Day, 45 Ann. 71; Civil Code, Art. 2643.

He quotes from Morawetz to the effect that "It is certain that shares in a corporation are not in reality intangible property, they are contract rights or choses in action," according to legal terminology. Shares are usually represented by certificates. Although these certificates are in their origin merely evidences of the holders' rights, they are really something more. They are treated in many respects as if they were the shares themselves and when passed from hand to hand are considered as

passing to the assignee all the equitable rights of the holder. The certificates thus have a value in themselves and may be *rightly treated as property*. They are similar in this respect to negotiable paper. The debt of a maker of a negotiable note is a mere contract right or *chose in action* belonging to the payee, but the note itself may *properly be treated as a chattel or thing in the hands of the holders*. So shares in a corporation are mere contract rights or choses in action, while the certificates are treated as the embodiment of those rights and *may be considered as chattels*. A distinction must be observed between shares considered abstractly as the sum of the shareholders' rights and the transferable certificates which represent those rights. The rights of the shareholder are mere contract rights or *choses in action,* but the certificates are *something more. They are constantly treated as tangible property,* in commercial transactions, and by reason of their negotiable character are in fact *tangible property* of great value just as negotiable notes and bills are. An action of *trover* may be brought for the conversion of a promissory note, and it has been rightfully held that shares may be the subject of a gift *causa mortis* by delivery of the certificates."

Counsel, after referring to checks as being tangible, movables, corporeal things which may be the subject of a manual gift without further formality, says: "So here a share of stock is not an obligation, it is an unconditional order to transfer the interest which Miss Sinnot had in the tangible property of the banking corporations to Mrs. Langtry, the person to whom she delivered the certificates of stock. The shares of stock represent the property of the corporation and to all intents are the property at least in the sense that a check is money."

Counsel further say: "It may be well to note here that the *donation causa mortis* of the common law is not the donation *mortis causa*" of our law, the Civil Law. With us the donation *"mortis causa"* can be made only by last will and testament; under the common law, however, three kinds of donations are made known. (1st) The donation *"inter vivos."* (2nd) the *"donatio causa mortis."* (3rd) That " by last will and testament." The second is a gift during life, but in expectation of death and not to take effect until after the death of the donor.

"It will thus appear that the *"donatio mortis causa"* of the common law is but the donation *inter vivos* established by our Code with this exception, that the first was not complete until the death of the donor, while the second becomes effective at once. There is nothing, however, in our law which prevents a donor from imposing upon his donation

*inter vivos* the condition that it should not be effective until after the death, as was perhaps done in the present case, and we therefore have a case before us in which all the doctrines of the cited cases as to whether a certificate of stock is such a chattel as may be the subject of a donation *inter vivos* without other formality than the mere giving, accompanied by delivery, apply with full force." Counsel contends that the words used by Miss Sinnot referring to the certificates "after my death they are yours," giving them the greatest weight, have simply the effect of imposing upon a donation *inter vivos* what might be termed a *suspensive condition*.

Our Code divides things into "corporeal" and "incorporeal," "movables" and "immovables." It declares that "corporeal things" are such as are made manifest to the senses, which we may touch or take, which have a body whether animate or inanimate. Of this kind are fruits, corn, gold, silver, clothes, furniture, lands, meadows, woods and houses; that "incorporeal things" are such as are not manifest to the senses and which are conceived only to the understanding, such as the rights of inheritance, servitude and obligations. C. C. 460.

Referring to the division of things into "movables and immovables" the Code says:

"Incorporeal things consisting only of a right are not of themselves strictly susceptible of the quality of movables or immovables, nevertheless they are placed in one of these classes according to the object to which they apply, and the rules hereafter established." C. C. 470.

Referring to the subject of "delivery," where delivery is necessary for the completion of a title, Article 2478 declares that tradition or delivery of movable effects takes place either by their *real tradition* or by the delivery of the buildings in which they are kept or even by the bare consent of the parties if the things can not be transported at the time of sale, or if the purchaser had them already under another title; that "the tradition" of incorporeal rights is to be made either by the delivery of the titles "and" of the "act of transfer" or by the use made by the purchaser with the consent of the seller. (C. C. 2478, 2481). Article 743 of the Code, referring to servitudes, declares that "servitudes are established by all acts by which property can be transferred, and as they *are not susceptible of real delivery,* the use which the owner of the estate, to whom the servitude is granted, makes of this right supplies the place of delivery.

Article 2247 refers to "delivery" as being of two kinds—one as "actual" the other as "constructive" delivery.

Under the heading of *Donations Inter Vivos* (between living persons), and *Mortis Causa* (in prospect of death), the Code declares, in Article 1467, that property can neither be acquired nor disposed of gratuitously unless by donations *inter vivos* or *mortis causa,* made in the forms hereafter established. It then declares (Art. 1468) that a donation *inter vivos* (between living persons) is an act by which the donor divests himself at present and irrevocably of the thing given in favor of the donee who accepts it; that a donation *mortis causa* (in prospect of death) is an act to take effect when the donor shall no longer exist by which he disposes of the whole or a part of his property and which is revocable. (Article 1469.)

Article 1570 declares that "no disposition *mortis causa* shall henceforth be made otherwise than by last will and testament. Every other form is abrogated," and Article 1576, that "the custom of making verbal testaments, that is to say resulting from the mere deposition of witnesses who were present when the testator made known to them his will, without having committed it or caused it to be committed to writing, is abrogated."

Article 1536 provides that an act shall be passed before a notary public and two witnesses of every donation *inter vivos* of immovable property or incorporeal things, such as rents, credits, rights or actions, under the penalty of nullity, and Article 1538 provides that a donation *inter vivos,* even of movables, will not be valid unless an act be passed of the same as is before prescribed, and such an act ought to contain a detailed estimate of the effects given, but Article 1539 declares that "the manual gift," that is the giving of "corporeal movable effects, accompanied by a real delivery," is not subject to any formality.

The French writers inform us that formerly the French law, in addition to donations *inter vivos* and *mortis causa,* authorized another form of gratuitous disposition of property—the *'donation causa mortis,"* but that this character of donation had been abrogated. We quote on this subject from Dalloz & Verge under Article 893 of the Code Nopoleon:

"*L'Ancien droit,* outre la donation entre vifs et le testament, admettait encore une autre forme de disposer; *'la donation a cause de mort.'* Cette libéralité participait à la fois du testament, en ce qu'elle était faite en vue de la mort et en ce que, toujours révocable,

elle ne devenait définitive qu' au décès du donateur, et de la donation, en ce qu'elle était faite sous la forme d'un contrat bilatéral et pouvait être faite avec tradition."

"Le Code Civil ne reconnaissant que deux modes de disposer de ses biens à titre gratuit, la 'donation entre vifs' et le 'testament,' á, par cela même, et sauf l'exception de l'art, 1082 en faveur du mariage, proscrit les "donations a cause de mort." Mais si un acte qualifié 'donation a cause de mort' présentait les caractéres et les formes d'un testament, il vaudrait comme tel, quelle que fut son analogie avec l'ancienne 'donation à cause de mort.' En supposant qu'une donation a cause de mort, faite et acceptée dans un testament en forme authentique, soit valable, d'aprés la règle 'utile per inutile non vitiatur,' elle ne vaudrait que comme disposition testamentaire, et la même raison, par conséquent, ne peut s'étendre au *don manuel* à cause de mort, l'écriture étant de l'essence du testament. Si la donation à cause de mort, faite par un acte en forme, est radicalement nulle, il en doit être ainsi á plus forte raison, du don manuel à cause de mort, qui n'est qu'une donation à cause de mort, moins la garantie de l'ecriture et de l'authenticité."

A verbal donation *"causa mortis"* of a movable, whether it be a "corporeal" movable or an "incorporeal" movable, is invalid under our laws. According to the version given by Mrs. Langtry herself this was the character of the donation made to her by Miss Sinnot. Appellee claims that the donation was a manual donation *"inter vivos,"* but it can not be at one and the same time a donation *"inter vivos"* and a donation *"causa mortis."*

In order to have been a manual gift *inter vivos* it was essentially necessary that the donor should have "divested herself at once and irrevocably of the thing given in favor of the donee who accepted it." The moment the effect of the donation was to be postponed to the death of the donor it became an unauthorized donation *causa mortis.*

It is a mistake to suppose that because an understanding should have been reached between *"two living persons"* that the ownership of the property of the one should vest at her death in the other, the agreement evidenced a donation *"inter vivos."* It is the "thing done" by the living persons and not the fact that what was done should have been transacted *"between living persons"* which gives character to the act. Independently however of this view of the situation the appellee's claims could not be sustained. It is true that shares of stock in corporations

"are movables." Article 474 of the Code expressly declares them to be movables, but they are not corporeal movables. Stockholders in a bank are not the "owners of any portion of the bank's property, though they are interested in its affairs and indirectly and consequentially in its property. Article 436 of the Code declares that the estate and rights of a corporation belong so completely to the body that none of the individuals who compose it can dispose of any part of them. In this respect the thing belonging to the body is very different from a thing which is common to several individuals as respects the share which every one has in the partnership which exists between them, and according to the above rule, what is due to a corporation is not due to any of the individuals who compose it." (Article 437.)

The stockholders are neither owners of the property of the corporation, nor are they creditors of the corporation. The certificate of stock which they may hold does not represent any portion of its property, nor do they evidence any "debt" due to them by the Bank.

Article 1763 of the Code says that the "contract" must not be confounded with the instrument in writing by which it is witnessed, and so "rights" must not be confounded with writings which evidence them. The certificates involved in this case are mere "admissions" of the Hibernia Bank that the party named therein is interested in the Bank to the extent therein named (Board of Trustees vs. Campbell, 48 Ann. 1549). The rights of the holders of the shares in the Bank are back of and beyond the certificates. The certificates could be lost or destroyed and the rights of the owners of the stock would remain intact. They are not orders of the owners on the Bank to pay money to any one, as counsel claim. Parties having the mere possession of these certificates would have no shadow of right from that single fact to demand payment of any money from it or to be recognized by it as shareholders. They are not negotiable in the commercial sense of that word, though by proper assignment and transfer thereof the legal title of the shares of stock referred to therein may be shifted. Until assigned or transferred, possession of the certificates and title to the shares do not go together. The right of a stockholder in a bank is an incorporeal right; it is not, when not transferred, susceptible of "a real and actual delivery" to the transferree or donee; it is susceptible only of a "constructive" delivery and this constructive delivery is not simply by the delivery of the titles, but by *accompanying the delivery of the titles* "with the act of transfer" of the same. (C. C. 2481.)

The certificates of themselves and without such act of transfer would not pass from hand to hand by simple delivery; something else would have to appear upon them to make them pass in that way. They are not "substantive" and "completed things" in commerce without a transfer of some kind. We have no reason to doubt the absolute correctness of the testimony of Mrs. Langtry as to what took place between Miss Sinnot and herself. Her testimony gives evidence of candor and sincerity, but where the law, to support certain acts and contracts, requires evidence of a particular kind and sufficiency, the courts are powerless to receive other or less as proof. We are constrained to recognize that the ownership of the shares of stock here involved has never passed from Miss Emily C. Sinnot, and that the same is now in the Succession of Miss Sinnot. Matters are not before us in such a manner as to authorize us to deal with the rights of Mrs. Otto Weber as residuary legatee; her rights are reserved to be determined hereafter.

For the reasons herein assigned it is ordered, adjudged and decreed that the judgment appealed from be, and the same is hereby annulled, avoided and reversed, and it is now ordered, adjudged and decreed that the Succession of Miss Emily C. Sinnot is the legal owner of the shares of stock of the Hibernia National Bank of New Orleans which form the subject of this litigation; and it is further ordered and adjudged that Mrs. Annie Thompson, wife of George Langtry, defendant herein, be and she is hereby ordered to deliver the certificates for said shares of stock to Mrs. Otto C. Weber as executrix of the Succession of Miss Emily C. Sinnot. It is further ordered and decreed that all the rights of the Succession of Miss Emily C. Sinnot against the Hibernia National Bank, growing out of said ownership be, and the same are reserved.

It is further ordered, adjudged and decreed that all and any rights which the said Mrs. Weber may have in the premises, as legatee of Miss Emily C. Sinnot be, and they are hereby reserved. Costs of both courts to be borne by the appellee in solido.

MONROE, J., concurs in the decree.

PROVOSTY, J., concurs in the decree.