(51 South. 115.)

No. 17,755.

Succession of GRAF.

(Nov. 15, 1909. Rehearing Denied Jan. 17, 1910.)

*(Syllabus by the Court.)*

1. HUSBAND AND WIFE (§ 31*) — MARRIAGE CONTRACT — CONSTRUCTION — CONVENTIONAL COMMUNITY.

A marriage contract, whereby the intended spouses are secured the administration of their separate property, which stipulates that property acquired with the capital or revenues of the paraphernal estate of the intended wife shall be paraphernal and the property acquired with the separate funds of the husband shall be his separate property, and which, further and finally, stipulates that all property acquired through the industry of the spouses shall be considered community property, establishes a conventional community which does not materially differ from the community which would be established by law, in the absence of a contract, and this though the first article of the contract declares that the parties renounce the community.

[Ed. Note.—For other cases, see Husband and Wife, Dec. Dig. § 31.*]

2. HUSBAND AND WIFE (§ 262*)—"COMMUNITY PROPERTY."

All property acquired under the régime of the community whether in the name of one spouse or the other is presumed to be community property. The wife, claiming such property to be hers, must establish her pretensions by legal proof. The fact that the title was taken in her name does not even raise a presumption in her favor.

[Ed. Note.—For other cases, see Husband and Wife, Cent. Dig. §§ 913, 914; Dec. Dig. § 262.*

For other definitions, see Words and Phrases, vol. 2, pp. 1343, 1344; vol. 8, p. 7608.]

3. ESTOPPEL (§ 26*) — HUSBAND AND WIFE (§ 49½*)—ESTOPPEL BY DEED.

Whilst the husband is estopped to deny the truth of the recitals contained in a conveyance of property to the wife, to which he was a party, his forced heirs, alleging that the conveyance was made to the prejudice of their legitime, are not so estopped, and, where it is shown by them that property acquired in the name of the wife was paid for with the separate funds of the husband, they being his children by a previous marriage, the investiture of the title in the wife will be regarded as in the nature of a donation, and reduced to a value not exceeding one-third of the donor's estate.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 61, 62; Dec. Dig. § 26;* Husband and Wife, Cent. Dig. §§ 249–255; Dec. Dig. § 49½.*]

4. EXECUTORS AND ADMINISTRATORS (§ 314*)— APPEAL BY ADMINISTRATORS.

The administrator of an estate, some of the heirs of which reside elsewhere, who is made defendant in a proceeding by the widow of the decedent, the result of which is to have certain real estate, inventoried as belonging to the succession, though standing in the name of the widow, decreed to belong to the widow, has a right to appeal from the judgment so rendered, for the benefit of those whose estate he administers, and this though there be an attorney for absent heirs who does not appeal.

[Ed. Note.—For other cases, see Executors and Administrators, Dec. Dig. § 314.*]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

In the matter of the succession of Herman Graf. Rule by widow against Otto P. Graf, as forced heir and administrator, to show cause why certain real estate should not be decreed to her. From an order making the rule absolute, he appeals. Reversed and remanded.

Geo. J. Untereiner, for appellant. John Bassich, Jr., for appellee. M. S. Dreifus, for absent heirs.

Statement of the Case.

MONROE, J. Upon the death of Herman Graf, Otto Graf, his son, by a former marriage, was appointed administrator of his estate, and, having provoked the appointment of an attorney to represent four other (major) children of said former marriage, who are said to be absentees or nonresidents, he caused an inventory to be made, in which were included certain real estate appraised at $2,250, and certain cash and movables appraised at $578.42. The widow thereupon ruled Otto Graf, as forced heir and administrator and the attorney for the absent heirs, to show cause why the real estate mentioned should not be decreed to belong to her, and, after appearance and hearing, there was judgment making the rule absolute, from which judgment Otto Graf individually and as administrator prosecutes this appeal.

Plaintiff in rule alleges that, before she married decedent, she entered into a contract with him, whereby they renounced the community, and stipulated that the property then owned by her should be held to be paraphernal, "said property or funds * * * being fixed at $5,000, in notes and cash," and that after the marriage she purchased the property in question with her paraphernal funds. Otto Graf, individually and as administrator, by way of answer to the rule and of plea in reconvention, alleges that the property in question was purchased with the separate funds of the decedent, who permitted the title to be taken in the name of his wife "for convenience, to deprive this defendant, his brothers and sisters, who are coforced heirs herein, of their rights and legitime in his estate and turn the same over to his wife," and he prays that the succession of the decedent, "separately or in community," be recognized as the owner of said property. And the attorney appointed to represent the absent heirs adopted the return thus made. The marriage contract referred to declares (in article "First") that the "intended husband and wife" shall (be) separate in property, they having formally renounced "the community, * * * excepting as follows:" Then follow stipulations to the effect that all the property owned by the intended wife prior to the marriage, or that may thereafter be acquired with paraphernal means or revenues, is, and shall be, paraphernal, and that the administration thereof is reserved to her; that the amount owned by her in notes and cash amounting to $5,000 is "to be, and remain, her separate, paraphernal property, at her disposal; that the said Herman Graf" has movable property, the same to remain as it is; "that before his, Herman Graf's, death, he will make such disposition in favor of the said Frieda Auer, his intended, as the law of the state, or states, where the property is situated will

permit or sanction, the legitime, or shares, of his issue with his predeceased wife, Margaret Dasing, to wit: (1) Herman, (2) Otto, (3) Wilhelm, (4) Emilia, (5) Louise, Graf, being fixed by the law of Louisiana."

The next, and last, article reads:

"It is hereby further agreed and understood that all funds or property acquired during the existence of the marriage * * * by the industry and exertions of the said Herman Graf or Frieda Auer, * * * except by separate funds, shall be considered as community property, belonging one half to each or their heirs."

The contract was entered into on April 13, 1908, and the parties were married on the following day. On the day of the marriage the decedent had on deposit in the savings department of the Metropolitan Bank the sum of $2,945. On July 2d following he withdrew $275, and authorized Freed & Clesi, real estate agents, to offer $2,500 on his behalf for certain property on Louisiana avenue, which offer was refused. On July 13th he authorized another offer, for the same property of $2,800, which was accepted, but, when called on to comply with it, he declined to do so, saying that his wife did not want the property, and that the owner could not hold him, for the reason that he had nothing, which statement, as we take it, was made at some time subsequent to August 13, 1908. In the meanwhile, to wit, on August 3, 1908, plaintiff in rule (signing her name Frieda Verena Metzger Auer), authorized by Herman Graf, her husband, made an offer of $2,500 for the property here in question (on Bordeaux street) and made a deposit of $250 cash, and on August 13th the property was conveyed to her and she paid the balance of the price ($2,250) and $25 attorney's fee. On the same day Herman Graf drew from his own funds in the bank the sum of $2,275, informing the paying teller, who asked him why he was withdrawing so large a sum, that "he wanted to invest it in a home." He died less than than six months later (Jan-

uary 26, 1909), and left an estate appraised (including the property in question) at $2,763.42.

The testimony of plaintiff in rule as to the sources from which she derived the $2,500 with which she paid for the property in question is, in substance, as follows:

She says that her cousin, Charles Huber, paid her $750, which he had borrowed, with interest, and Huber testifies that on August 5, 1908, he paid his note of $750, which had fallen due on May 26th preceding, and which is shown to have borne interest. It, however, appears that on August 6, 1908, plaintiff deposited $800 in the savings department of the Metropolitan Bank, which amount remained there until October 6, 1908.

She says that she obtained $400 from Emile Reiman in repayment of money loaned, and Reiman testifies that he had borrowed $800, of which he repaid $400 (with interest, as we infer) on April 1, 1908. Plaintiff testifies that she spent $225 for clothing, etc., when she was married (say April 14, 1908), and, turning to her account with the Germania Savings Bank, we find that on April 13, 1908, she deposited in that institution the sum of $190, which she admits was part of the money paid by Reiman, and which, with a balance of $22.22, standing to her credit, and interest to December 31, 1908, has increased to $216.44, the balance standing to her credit at the time that she testified.

She testifies that she obtained $1,000 from Mrs. Widow Mary Finnegan in repayment for money loaned, and Mrs. Finnegan, called to corroborate her, testifies, in part, as follows:

"Q. Do you know Mrs. Graf? A. I have known her for the last 10 years, and I have known that she has always been a hard-working girl. By the Court: Now, just answer the questions asked you. By Mr. Bassich (Plaintiff's Attorney): Q. Did you have any business transactions with her? A. Yes, sir. Q. Of a monetary kind? A. Yes, sir; $1,000 that I got from her. Q. She loaned you $1,000. A. Yes, sir. Q. When was that? A. She loaned me that money on July 27, 1907. I returned her that money in July, 1908, at about 5 o'clock in the evening, on the same date of the month. Q. You state she is hard-working? A. Hard-working; I have known her to work very hard. Q. How did she make the money? A. By cooking, housework, general domestic. Q. Was she a very liberal woman with her money? A. No, sir; she was very tight with her money, and she had money. * * * Cross-examination. Q. What security did you give her for that? A. Nothing at all. Q. Where do you live? A. I live 5011 Laurel street, and at the time that I got that money I was up the coast, farming. * * * Q. Did you write or come down? A. I came to her verbally, and asked her for it personally. Q. Was your husband living then? A. Yes, sir. * * * Q. Did you have any real estate? A. Yes, sir. * * * Q. What did it consist of? A. Of a house on a lot 32-feet front by 60 feet deep. I sold it. * * * Q. What did you get for it? A. I got $1,900. Q. When did you sell it? A. When did I sell it? Q. Yes. By the Witness: Judge, I object to these questions. By the Court: What is the object? By Mr. Untereiner (Attorney for Otto Graf): I want to show where this money came from to pay this $1,000. That is what I want to see. By the Witness: Well, attorney, you don't think people steal their money? By Mr. Untereiner: I don't know so much about that, madam, and I am not here to be corrected by you. By the Court: I don't think it has any reference to the case. The question is whether or not the money was loaned by this lady to her. If you can contradict that testimony by other witnesses, you can do it, Mr. Untereiner. Whether the money was paid back is indifferent. By Mr. Untereiner: I reserve a bill."

Plaintiff testifies that she obtained $1,000 from Mr. Fous, also in repayment for a loan, but Fous was not called to corroborate her. It appears that the money ($2,250) with which she made the payment on August 13th ($250 having already been deposited) was taken from a satchel which plaintiff carried around her waist, and she testifies that none of it had been deposited or was drawn out of the banks. Why it was not deposited is not stated. Being asked about the $800 deposited in the Metropolitan Bank on August 6th, she said that she had worked for it, and that it had nothing to do with the money, including that paid by Huber on August 5th, with which she paid for the property. Concerning the payment of Huber, she testifies, in part, as follows:

"Q. How much did he pay you? A. $750. Q. No interest? A. Yes, sir; he did. Q. How much interest did you get? A. I don't remember. Q. What interest was that note bearing? By the Court: I have heard enough. If you have got any testimony to counterbalance, you can offer it. That is all."

It appears that the $2,250 was paid, in part, with two $1,000 bills, but the plaintiff was unable to recall that fact with any certainty. It also appears that in addition to the $2,250 used (on August 13th) in paying for the property $25 was paid to the attorney (and notary) for examining the title; the total of $2,275 being the exact amount which had been on that day withdrawn from bank by Herman Graff, for the purpose, as he stated to the teller of the bank, of buying a home.

### Opinion.

It is not alleged that the title here attacked is simulated. Hence the Act No. 5, p. 12, of 1884, is without application, and the case falls under the provisions of the law which regulates the ownership of property acquired by married persons, limits the power of the person, who, having children by a former marriage, contracts a subsequent marriage, to dispose of his property by donation, inter vivos, or mortis causa, authorizes the reduction of excessive donations to the disposable portion, and prescribes the manner in which such reduction is to be effected. If it be true that the property in dispute was purchased by plaintiff in rule with paraphernal funds, the case is at an end, and the judgment appealed from should be affirmed. If, upon the other hand, it was purchased in plaintiff's name with the separate funds of her husband, it would be, in effect, a donation which, if in excess of that allowed by law, should be reduced to the portion which a husband having children by a previous marriage can lawfully give to his subsequent wife. And, finally, if the property was paid for with the funds of the community, though purchased in the name of the wife, it should be restored to the community. We refer to the community because, considering the marriage contract as a whole, we find that there was a conventional community thereby established which differed in no material respect from that which the law would have established if there had been no contract. And, that being the case, it follows that all property acquired during the marriage, whether in the name of the one spouse or the other, is presumed to have fallen into the community, unless the contrary be shown. The wife, claiming such property to be hers, must establish her pretensions by legal proof. "The fact that the title was taken in her name does not even raise a presumption in her favor." 2 Hennen's Dig. p. 883. The husband is not permitted to make such proof unless his intentions to acquire for himself is made manifest in the act of purchase. Joffrion v. Bordelon, 14 La. Ann. 618; Hero v. Bloch et al., 44 La. Ann. 1032, 11 South. 821; Succession of Burke, 107 La. 82, 31 South. 391. But the forced heirs of the husband have a standing in court (to the extent necessary to protect their legitime) to attack the title to property acquired in the name of the wife and alleged to have been paid for with the separate funds of the husband, under Civ. Code, art. 1502, which provides that donations to the prejudice of the forced heirs may be reduced to the disposable portion, and under Act No. 13, p. 10, of 1882, which amends and re-enacts Civ. Code, art. 1752, to read:

"A man or woman who contracts a second, or subsequent, marriage, having children by a former marriage, can give to his wife, or she to her husband, either by donation or by last will and testament, in full property or in usufruct, not exceeding one third of his or her property."

Considering, then, the question whether the plaintiff in rule has shown that the property in dispute was purchased with her paraphernal funds, or whether the defendants have shown that it was purchased with the separate funds of the husband, it appears that

on the day of his marriage (April 14, 1908) Herman Graf had on deposit in bank the sum of $3,000; that thereafter, up to July 3d, he drew out $91.50, leaving the balance of $2,908.50; that on July 3d, the day upon which he made the offer of $2,500 for the Louisiana avenue property, he drew $275, which amount he did not, however, use as a deposit in support of that offer or of the offer of July 13th, which was accepted and which he subsequently refused to comply with, on the ground that his wife did not like the property.

Between July 3d, the day upon which he drew the $275, and August 3d, the day upon which his wife made her offer of $2,500 for the property in dispute and made the deposit of $250, he made no deposits and drew no money, but on August 3d he drew the additional sum of $25, and on August 13th (the day on which the purchase was made and the price, with the attorney's fee of $25 paid), he drew $2,275, the exact amount necessary to make those two payments, and told the teller of the bank that he intended to invest the money in a home. He died less than six months later, and the inventory of his estate shows that he left but $378.67 cash in bank, his account showing that after August 13, 1908, he deposited $106.67 and drew $165.39. The account to which we refer had been running from July 6, 1903, and shows but five drafts in excess of $100, of which one for $120 was made a few days before his marriage; another, for $275, was made on the day of his first offer to buy the property, and still another, of $2,275, was made on the day that his wife paid that sum, as the balance of the price of the property in dispute and as the fee for the examination of the title, the other two drafts having been made in August, 1903. The account also shows that his deposits were usually of less sums than $50, and sometimes less than $5, from all of which, and from the character of the litigants, as disclosed by the evidence, we think that the large amount drawn by the decedent about the time of the acquisition of the property should appear either in his bank account or in his estate. It is however, wholly unaccounted for, save by its investment in the property here in dispute. Upon the other side we have a thrifty German woman, who had accumulated the savings from her work as a domestic servant, and habitually kept them in bank, where they bore interest, but who says that she was carrying upon her person about the time of the purchase in question something like $3,000, or $3,300, so that the payments of $250 and $2,275 on account of the property do not appear in either of the accounts kept by her in the banks. We have, however, already recapitulated the testimony given in support of plaintiff's pretensions, and do not consider it worth while to say more at this time than that it lacks originality and fails to convince, notwithstanding that counsel for appellant was by erroneous rulings precluded from completing his cross-examination of plaintiff and her witness, Mrs. Finnegan. Our conclusion upon the questions under consideration, then, is that the property in dispute was paid for with the separate funds of the now deceased husband. The decedent had, however, the right to give his wife one-third of his estate, and it was contemplated by the marriage contract that he should do so, from which, and from the law applicable thereto, it follows that, regarding the investiture of the title in dispute as in effect a donation of the property to the wife, such donation is not null but is merely reducible to the disposable portion, the manner of determining which is pointed out by law. Civ. Code, arts. 1502, 1505, et seq.

As appears from the statement of the case, plaintiff proceeded against Otto Graf as administrator and individually, and against the attorney who had been appointed to represent the four absent heirs, and she prayed that

they be ordered to show cause "why * *, * the only piece of real estate inventoried in this succession should not be adjudged * * * not to belong to the succession of Herman Graf, but, to mover, Frieda Vereina Metzger Auer Graf, his widow; that she be declared the only and true owner of the said real estate. * * *" Otto Graf, as administrator and individually, filed a formal answer to the rule, denying the allegations of ownership contained therein, alleging that the property had been purchased with the separate funds of Herman Graf, and praying that the succession be recognized, "separately or in community," to be the owner thereof; also praying for general relief. From the note of evidence made upon the trial of the rule it appears that the attorney who had been appointed to represent the absent heirs made the request (to which there was no objection noted):

"I ask leave to adopt Mr. Untereiner's return, as the return of the attorney for the absent heirs."

Whether after thus appearing he participated in the trial is not shown. The motion for new trial was made in the name of "George J. Untereiner, attorney for Otto P. Graf, individually and as administrator of this estate," and the motion for appeal was made in the name of "Otto P. Graf, individually and as administrator," etc. The question, therefore, presents itself: Does the administrator represent the absent heirs for the purposes of the appeal, or does he merely represent his own interest, as a forced heir of the decedent? As a matter of first impression, it would perhaps appear that, as an attorney had been appointed to represent the absent heirs, he alone would be authorized to represent them for the purposes of the appeal. It will, however, be found upon examination that, whereas there is no provision of law which in specific terms confers upon the attorney for absent heirs the authority

to take an appeal on behalf of those whom he represents, Code Prac. art. 572, provides that:

"Tutors, curators, and other persons charged with the administration of another's estate, may appeal for the benefit of the persons whose property they administer, if they deem an appeal necessary."

Let it be conceded that in the general authority conferred upon the attorney for absent heirs, by Civ. Code, art. 1210 et seq., the authority to appeal is included, we then have two persons who are authorized by law to appeal for the benefit of the absent heirs of the estate, the one (the attorney) upon whom the authority is conferred in general terms, and the other (the administrator or persons charged with the administration of the estate) upon whom the authority is conferred in specific and precise terms, and we have here a case in which the authority so conferred upon him has been exercised by the administrator, whilst that conferred upon the attorney for absent heirs has not been exercised. The judgment appealed from decrees that the property in dispute (claimed, upon the one hand, to belong to the plaintiff in rule, and, upon the other, to belong to the succession under administration) does not belong to the succession, but, belongs "to plaintiff in rule," and further decrees said plaintiff in rule "to be the only and true owner of the said real estate; to own and hold it as her separate, paraphernal, estate." No objection was made by either of the parties to the form of the proceeding, which was selected by the plaintiff in rule, who tendered to the administrator and to the absent heirs, represented by the attorney appointed by the court, the issue which the court has decided. It may be that the attorney did not think an appeal necessary or advisable; but the administrator thought otherwise, and, being charged with the administration of the estate, has exercised the authority, specifically conferred upon him, to appeal for the benefit

of the persons whose property he administers if he deems an appeal necessary.

The case, it will be observed, is not one where, as in Kohn, Syndic, v. Wagner, 1 Rob. 275, the judgment appealed from merely establishes the privileges of the creditors with regard to each other, or, as in Succession of Pettis, 11 La. Ann. 177, Succession of Hartigan, 51 La. Ann. 126, 24 South. 794, and Succession of Trouilly, 52 La. Ann. 284, 26 South. 851, an administrator or executor undertakes to champion the rights of creditors whose claims have been rejected. In the case first cited, this court said:

"It is no part of the administrator's business to swell the amount of the indebtedness of the estate which he administers beyond the limits fixed by the court of the first instance."

And in the case next cited (Succession of Hartigan) it was said (quoting the syllabus):

"It is the duty of executors and administrators to act for the protection of the heirs and legatees of a succession and the mass of creditors, not for that of special creditors."

In the case at bar the administrator acted (in resisting plaintiff's demand) and he has appealed (as the law says he may, if he deems an appeal necessary) for the benefit of the persons whose property he administers. Whether he would have considered it necessary to appeal, as administrator, if an appeal had been taken by the attorney for absent heirs, we do not know, nor, so far as we can see, are we called on to inquire. As matters stand, we consider that he is rightfully here, and that as administrator he represents the absent heirs for whose benefit he took the appeal. It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside and annulled; that there now be judgment decreeing the property here claimed by the plaintiff in rule to have been the subject of a donation to her by her deceased husband, Herman Graf; and that said intended donation be reduced to a value not exceeding one-third of the estate of the donor. It is further decreed that this cause be remanded to the district court to be further proceeded with in accordance with the views expressed in this opinion and the law, the plaintiff in rule, appellee herein, to pay all costs.