COMMERCIAL TRUST & SAVINGS BANK, Tutor & c

 vs No. 8097.

WIDOW EMILE THORENGREN & al, Appellants.

 November 14th, 1921.

Court of Appeal
PARISH OF ORLEANS
14/21
Stansbury

55

COMMERCIAL TRUST & SAVINGS BANK, Tutor & c

vs No. 8097.

WIDOW EMILE THORENGREN & al, Appellants.

CHARLES F. CLAIBORNE, JUDGE.

This is a suit to have the wife and her heirs declared the separate owners of property purchased during the community.

Emile Thorengren married Odelle Borda in July 1901; by an act before Felix J. Dreyfous, Notary, dated March 5th, 1906, Vicellio sold

"unto Mrs. Odelle Borda, wife of Mr. Emile Thorengren, here present accepting, and purchasing, with the authorisation of her said husband, who is also present"

the property in controversy on First Street; the sale was made for

"the price of $1400 cash, which the purchaser has presently paid to the vendor, who acknowledges the receipt thereof and grants acquittance and discharge for the same".

The act is signed by the wife and by the husband.

The act does not declare that the wife purchased the property as her separate and paraphernal property, nor that she pays the price with her separate and paraphernal funds under her separate administration.

Odelle Borda, wife of Emile Thorengren, died in November 1912, leaving three children issue of her marriage with Thorengren, to whom the plaintiff herein was appointed dative tutor.

Emile Thorengren contracted a second marriage on June 28th, 1913 with Kate _____; he died in 1917, leaving as only heirs his three children above named, issue of his marriage with Odelle Borda and one child, Jake Thorengren, issue of his second marriage with Kate.

The plaintiff in this suit claims the property above mentioned as the separate and paraphernal property of the first wife,

56

and as such inherited by the three minors of whom it is the tutor; and the defendant contends that it was community property; and that is the question to be decided by us.

The judgment of the District Court was in favor of the plaintiff, and the defendant has appealed.

The defendant argues very correctly that notwithstanding the fact that the title to the property was taken in the name of Odelle Borda, wife of Emile Thorengren, the presumption is that the property belonged to the community; the burden of proof was upon her and her heirs to establish _dehors_ the act that the property was hers for having been purchased with her own separate and paraphernal funds under her separate administration. C. C. 2399 (2369), 2402 (2371); Bachino vs Coste, 35 A. 570; 41 A. 274; 42 A. 357; 43 A. 144; 47 A. 768; 50 A. 216; 1220; 105 La., 35; 107 La. 82, 456; 111 La. 776; 125 La. 204; 126 La. 611; 128 La. 919; 130 La. 571; 131 La. 1 .

But this presumption may be rebutted by the wife. 42 A. 357; 50 A. 1220 (1227).

The admission of the husband in the act of sale that the property purchased in the name of the wife is her paraphernal property is not binding upon the forced heirs of the husband. Bachino vs Coste, 35 A. 570; 125 La. 197; 111 La. 305 (309); 41 A. 244; 48 A. 785; 128 La. 919.

Has the plaintiff rebutted this presumption?

Amelia Borda, wife of Breffel, a sister of Odelle, first wife of Emile Thorengren, testified that her mother and sister worked together as dressmakers and they saved their money; her sister paid for the property with $450 "savings money" when she was single and with $1200 her mother loaned her "because the house cost $1650"; during his marriage, Thorengren was working for $12 a week; he had no money saved up; during four years after she bought the property she used the rents $18 a month to pay her mother the money loaned; witness collected the rent and turned

them over to her mother; she paid all but $300 which were still due when she died, and which Thorengren was unable to pay; she took charge of the children; her mother had no bank account, she accumulated the money after many years; her sons lived with her and paid board; they made sometimes $50 a week sewing; her mother took in washing also; but employed a servant to wash; neither her mother, nor herself nor her brothers even invested any money in property or anything else; her sister kept her money in the house; she had no bank account; Thorengren and his wife and children lived with witness' mother four years after the house was bought.

Emile Chapman, a nephew of Odele Borda Thorengren, corroborates the testimony of Amelia Borda Breffel, and, in a measure, Clarence J. Chapman does the same.

On the other hand, Kate Thorengren, the defendant, testified that she was married in 1913; that she went to live in the half of the property in controversy, and lives there still; that her husband collected the rent from the other side; her husband worked for his aunt; she died and he got married; his aunt was insured, and he got a little money; when he married her he told her he had a house up there, and he brought her there; he told her they had put the title of the house in his wife's name for convenience; her husband was earning $12 a week, and was afterwards raised to $15 and $18; she knows nothing except what her husband told her-; when she married and moved into the half of the house, her husband's mother-in-law got mad and moved out, and then Thorengren rented the half to her mother.

Mrs. Rita Schroeder swears that Thorengren told her that the property was in his wife's name, and that his second wife paid for it; the second wife is her husband's sister.

Mrs. Mena Barmann testifies that Thorengren told her that he bought a home on First Street and that he was not going to move there, but

"he was going to draw $ 9.00 a side, $18.00 a month
and with the rent he was going to pay this house off".

We rise from the reading of this testimony with the
impression that both sides have a doubtful story about the origin
of the money with which this property was purchased. Yet one side
or the other must be true, as it was impossible for Thorengren,
who was raising a family and earning only $12 or $18 a week, to
have laid aside $1400 in 1906 with which to purchase this proper-
ty. Counsel for the defendant tells us that

"no more fanciful, improbable, and highly unreasonable
state of affairs can be imagined than that recited by
Mrs. Breffel".

But her credibility has not been impeached. In the succession
of Barrett, 43 A. 61, the Supreme Court said:

"Positive testimony by witnesses whose character
and credibility are not impeached cannot be overcome
by suspicion founded on mere improbability of their
statements when not shown to be in any sense impossible;
especially when the judge a quo who heard the testimony
has given credence to it".

And in the case of Dolhonde vs Lemoine, 32 A. 251:
"A fact testified to by competent witnesses will be
accepted as proved, no matter how eccentric it may
argue the witness to be, if there be no evidence tending
to impeach their credibility".

In Evans Pothier on Obligations, Vol. 2 p 194, we read:

"in deciding upon the truth of evidence, much stress
is laid upon the inherent probability of it, a criterim
which, within its proper limits, is attended with great
utility, but which, like all other general criteria, may
be carried too far x x x but each of the circumstances
alluded to will have their influence in forming a deci-
sion between the abstract improbability of the fact re-

59

lated, and the particular improbability of the imme-

diate relation under all its circumstances being false".

There are three elements in the testimony of plaintiff
which commends the judgment of the District Judge to us. The first
is that Thorengren did not himself go to the notary's ofice to
witness the act of sale passed to his wife. He had to be sent for.
This would indicate that he considered the sale to be his wife's
business and not his own. The second is that the plaintiff's wit-
nesses are all disinterested and speak from their own knowledge.
The third is that the title to the wife remained unimpeached by
the husband after the wife died, and as long as he lived. In
the Succession of Lewis, 45 A. 833, the Court said that

"when the wife has died without any attack on her title,
we consider that the laches and long acquiescence of the
husband's creditors till after her death would relax
the rigidity of proof ordinarily required in such cases".

On the other hand, the defendant testifies in the inter-
est of her child and in her own interest as his tutrix, and her
testimony is entirely hearsay consisting of declarations of her
deceased husband in his own interest.

"Admissions by one deceased, proved by a witness who
cannot be contradicted, much less convicted of perjury,
are the weakest kind of evidence, and scarcely worthy of
any belief". 1 H. D. p 518, No. 7; 105 La. 710; 44 A.
575; 40 A. 79; 36 A. 631; 35 A. 1005.

But in this case it would be more than doubtful if Thor-
engren's declarations would have been admissible at all. His ad-
missions against his interest could be heard, but not those in
his favor. Demarets, 144 La. 173 ;16 Cyc 1202 No. 2; 22 C.J.220.

Mrs. Schroeder contradicts all the other witnesses.

Mrs. Barmann says that Thorengren told her he was going
to pay the house off with the rents; while according to the act
of sale the price was paid cash.

60

The Judge of the District Court saw and heard all the witnesses; he believed plaintiff's witnesses, and we see no reason to doubt the correctness of his judgment. 44 A. 578, 1 La. Digest p 602, 606; 140 La. 387.

"Where the testimony of plaintiff is contradicted by that of defendant, judgment will be given in favor of the party having the preponderance of evidence. La. Bldg. Co. vs Beninato No. 7859 Ct. App.

It is therefore affirmed.
November 14th, 1921.